## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| United States of America *ex rel.* [UNDER SEAL], <br><br> Plaintiff, <br><br> v. <br><br> [UNDER SEAL], <br><br> Defendants. | Civil Action No. 3:22-cv-463-BJD-PDB <br><br> **FIRST AMENDED COMPLAINT** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

## DOCUMENT TO BE KEPT UNDER SEAL
## DO NOT ENTER INTO PACER

FILED

2023 MAR 10 AM 11: 20

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| United States of America *ex rel.* Karen Bowers,<br><br>               Plaintiff,<br><br>        v.<br><br>Complete Health Partners, Inc., Pharos Capital Group, LLC, Viva Health Inc., and Blue Cross and Blue Shield of Alabama,<br><br>           Defendants. | Civil Action No. 3:22-cv-463-BJD-PDB<br><br>**FIRST AMENDED COMPLAINT**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

ii

# Table of Contents

I.    Introduction ....................................................................................................1

II.    Parties ...........................................................................................................8

III.    Jurisdiction and Venue ...............................................................................11

IV.    Statutory and Regulatory Background .......................................................11

    A.    The False Claims Act...............................................................................11
    B.    The Medicare Program ...........................................................................12
    C.    Risk Adjustment......................................................................................14
    D.    CMS's Contracts with MAOs .................................................................19
    E.    Complete Health's Contracts with MAOs ..............................................21
    F.    CMS Requires MAOs and Downstream Providers to Ensure that the
        Diagnoses They Submit Meet CMS's Requirements................................ 24

V.    Allegations....................................................................................................25

    A.    Fraud Related to Complete Health's Coding Practices...........................27

        1.    Complete Health Submits False Diagnosis Codes to MA Plans In
            Order to Claim Higher Reimbursement from CMS...................................27
        2.    The Defendants Know, Recklessly Disregard, or Deliberately Ignore
            the Truth that Complete Health's Diagnosis Codes are Incorrect
            and Unsupported.................................................................................. 49
        3.    The MAO Defendants Have Knowingly and Improperly Avoided
            Returning Overpayments to CMS Arising From Complete Health's
            False and Fraudulent Diagnosis Codes................................................. 60

    B.    BCBS's Fraudulent Risk Adjustment Incentive Program.........................61

VI.    The Defendants' Violations of the FCA ......................................................66

    A.    Complete Health Defendants' Violations of the FCA ..............................66
    B.    The MAO Defendants' Violations of the FCA..........................................69

Qui tam Plaintiff-Relator Karen Bowers brings this action on behalf of the United States of America against Complete Health Partners, Inc.; Pharos Capital Group, LLC ("Pharos" together with Complete Health Partners, Inc., "Complete Health" or "Complete Health Defendants"); Viva Health Inc. ("Viva"); and Blue Cross and Blue Shield of Alabama ("BCBS") under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733. Relator, based on personal knowledge, relevant documents, and information and belief, alleges as follows:

## I.   **Introduction**

1.     This case involves the intentional overcharging of Medicare through false risk adjustment data.

2.     Complete Health is a provider group that offers primary care services to Medicare beneficiaries enrolled in Medicare Advantage ("MA") plans. Viva and BCBS are both health insurance companies offering MA plans that contract with Complete Health and other providers to provide medical services to their beneficiaries.

3.     The MA program allows Medicare beneficiaries to receive Medicare benefits from plans sponsored by private managed care organizations known as Medicare Advantage Organizations ("MAOs"). When a beneficiary elects to enroll in an MA plan, Medicare will pay the MA plan for the member with a prospective monthly payment, known as a "capitation" payment. The MA plan must use the capitation payments it receives to pay healthcare providers, including hospitals and physicians, for covered healthcare services provided to its enrolled beneficiaries. The MA plan bears the risk that the cost of the beneficiary's covered healthcare will exceed the capitation payments for the beneficiary.

4.     Medicare adjusts the rate it pays the MA plan for each member to account for the member's health risk. Medicare pays MA plans more if the plans'

1

members have certain diseases or illnesses that correspond to high healthcare costs. Medicare makes these payment adjustments based on data, known as "risk adjustment" data, which MAOs submit regarding the health status of their members.

5.      Medicare regulations require MAOs to collect and submit risk adjustment data from healthcare providers relating to each "encounter" with a beneficiary enrolled in an MA plan. The data the MAOs must include in their submission include diagnosis information from the encounter, reported using numerical codes. Each diagnosis code corresponds to a numerical risk factor that adjusts the amount Medicare pays the MA plan for a given member. The higher the sum of a beneficiary's risk factors (or "risk score"), the more Medicare pays the MA plan for the beneficiary. Because MAOs have a financial incentive to submit as many diagnosis codes as possible, Medicare requires MAOs to ensure and certify that the data they submit are truthful, complete, and accurate.

6.      Complete Health contracts with MAOs—including MAOs like Viva— to provide primary care services on a shared-risk basis, under which Complete Health does not charge the MAO for each service it provides, but instead receives a capitated payment determined based on the MAO's revenue for the enrolled beneficiaries it treats. Complete Health's profitability under its shared-risk contracts depends on its ability to improve the profitability of the beneficiaries to MA plans, which it can do by lowering beneficiaries' healthcare costs or increasing capitation revenue by submitting diagnosis codes that increase its patients' risk scores.

7.      This case involves the Defendants' use of fraudulent risk adjustment codes to cause Medicare to overpay for medical services. To fraudulently increase its reimbursement, Complete Health knowingly submits incorrect and

unsupported diagnosis codes to MAOs, which in turn submit the codes to CMS to calculate payments. Viva and BCBS (collectively, the "MAO Defendants") know that Complete Health's diagnosis codes are incorrect and unsupported. Despite that knowledge, the MAO Defendants continue to submit Complete Health's risk adjustment data to CMS and have knowingly and improperly refused to audit submitted data for incorrect and unsupported diagnosis codes. In addition, BCBS has implemented an incentive program to induce its providers, including providers other than Complete Health, to generate risk adjustment codes—regardless of whether those codes are accurate or supported by the patient's medical record.

8.     Complete Health's business model for risk adjustment is to generate as many diagnosis codes as possible for MAO patients—even when those diagnosis codes are not appropriate or clinically justified. It does so primarily by employing coders to parse through its patients' medical records to add diagnosis codes that raise the patient's risk score, which causes Medicare to increase its future capitation payments for the patient.

9.     The diagnosis codes that Complete Health adds are systemically incorrect and unsubstantiated. In many cases, the diagnosis codes are for conditions that do not exist or have no support in the beneficiary's medical record, including diagnoses for patients whose providers found no symptoms of the condition and diagnoses that are contradicted by the patient's medical records.

10.     The incorrect and unsupported codes that Complete Health submits include diagnoses of serious conditions such as opioid use disorder, sedative dependence, and major depressive disorder, as well as numerous diagnoses of senile purpura, a dermatological condition.

11.    Complete Health's improper diagnoses were reported to MAOs—including the MAO Defendants—and affected the risk adjustment payments paid by Medicare. The conditions that Complete Health misrepresented, or whose severity Complete Health inflated, were those that significantly increased payment under Medicare's risk adjustment payment model. Complete Health's submission of incorrect and unsubstantiated diagnoses generated millions of dollars in additional revenue to MA plans—including the MAO Defendants—and, by virtue of their shared-risk contracts, to Complete Health.

12.    Complete Health knows, recklessly disregards, or is deliberately ignorant of the truth that the diagnoses it submits to MA plans are routinely false. Complete Health uses coders to enter unsupported diagnoses directly into patients' medical records, expressly for the purpose of increasing the patients' risk scores. Complete Health is often the only provider to diagnose its patients with a condition in a given year. The patients whom Complete Health has diagnosed with serious conditions, including opioid use disorder, are often not treated for those conditions by Complete Health or other providers. Moreover, Complete Health often submits diagnoses from providers who had never diagnosed the condition before joining Complete Health. For example, Complete Health's recent acquisition of practice groups in Alabama coincided in a large increase in the diagnoses those practices made for conditions such as opioid use disorder and senile purpura.

13.    The addition of inappropriate diagnosis codes harms patients. A patient improperly diagnosed with opioid dependence, for example, may have trouble getting life insurance at a fair rate or at all.

14.    Complete Health's incorrect and unsupported diagnoses did not meet the requirements for risk adjustment data under the Medicare statute,

4

regulations, and the MAOs' contracts with the Department of Health and Human Services, Centers for Medicare and Medicaid services ("CMS"). If CMS had known that Complete Health's diagnoses were incorrect or unsupported, it would not have used the diagnosis codes to calculate its payments to MA plans.

15.     The MAO Defendants know that Complete Health systemically misrepresents the existence or severity of conditions of their members. Because it affects their reimbursement from CMS, the MAO Defendants monitor the risk adjustment data they receive. The MAO Defendants discovered that Complete Health's acquisition of provider groups resulted in sudden, large increases in the number of diagnoses their members received for conditions that correspond to higher reimbursement from CMS. In addition, Viva has audited Complete Health's diagnosis codes and concluded that a large percentage of many diagnoses are incorrect and unsupported. Nonetheless, despite their knowledge, the MAO Defendants continue to submit Complete Health's diagnosis codes and have refused to continue to audit the codes they have submitted to CMS because they are unwilling to give up the revenue associated with the false and fraudulent codes.

16.     For example, in 2021, Viva began auditing Complete Health after discovering a post-acquisition surge in diagnosis codes for patients of primary care groups acquired by Complete Health. Viva's audit, which examined hundreds of Complete Health members, found thousands of unsubstantiated diagnosis codes. This finding prompted discussions between Viva and Complete Health about the impropriety of the risk adjustment codes. Despite these warnings, and despite Complete Health admitting to Viva that many of its diagnosis codes were "clinically speaking" incorrect, Complete Health refused to change its practices and knowingly avoided deleting unsupported diagnoses.

17.    Initially, Viva deleted the unsubstantiated diagnosis codes it had found in its audit of Complete Health. Later, however, Viva changed course. It terminated its audit of Complete Health—over Relator's repeated objections and before reviewing all of Complete Health's records—despite the hundreds of false codes its initial audit had turned up and its knowledge of Complete Health's fraudulent coding practices. In addition, Viva determined that it would not do complete audits of Complete Health going forward. On information and belief, Viva changed course because it determined that the risk of CMS selecting the diagnosis codes for audit was low and the value of Complete Health's fraudulent diagnosis codes to its own reimbursement from CMS was high.

18.    BCBS also knew of Complete Health's fraudulent coding practices. When Relator joined BCBS, BCBS informed her that it was in negotiations with Complete Health to change their contract to a shared risk contract. In response, Relator repeatedly warned BCBS of Complete Health's practices when she joined BCBS in June 2022. For example, the Relator asked BCBS's analytics team to review Complete Health's coding. BCBS's team found massive spikes in risk adjustment coding that BCBS labeled as "potential problems." BCBS looked the other way, however. BCBS executives ignored Relator's warnings about Complete Health's practices, including an email analyzing the spikes in Complete Health's diagnosis codes. BCBS executives dismissed Relator's repeated efforts to warn BCBS away from its fraudulent conduct as "scare tactics." Despite Relator's warnings, BCBS allowed Complete Health's fraudulent risk adjustment coding practices to continue without so much as auditing the spikes in its coding.

19.    In addition, BCBS implemented an incentive program that rewarded all providers who hit certain risk adjustment coding benchmarks, which incentivized fraudulent risk adjustment coding among its providers. Providers

who "captured" more diagnoses—regardless of their accuracy—received incentive payments from BCBS. The only diagnoses the program counted toward an incentive payment were those that could increase BCBS's capitation payments from CMS. Relator repeatedly warned BCBS that its incentive program violated CMS guidelines and that BCBS should not pay providers to recapture risk adjustment codes. Acknowledging that the incentive program was improper, BCBS executives informed Relator that they planned to discontinue it after 2023. BCBS planned to continue submitting risk adjustment codes to CMS in the meantime, even though it knew there was a clear danger that diagnoses resulting from financial incentives would be inaccurate or unsupported.

20.    Pharos Capital Group owns and/or controls Complete Health and has caused the flood of incorrect and unsupported diagnosis codes that Complete Health has submitted. The private equity firm closely oversees the companies in its portfolio, including their strategic planning. Complete Health's generation of diagnosis codes for risk adjustment is a central part of its business model. In light of Pharos Capital's close management of Complete Health, it either knows, has recklessly disregarded, or acted with deliberate ignorance of the truth that Complete Health is falsifying the diagnosis codes it submits to MA plans.

21.    Under the FCA, each invalid diagnosis that the Defendants submitted or knowingly caused MAOs to submit to Medicare is a false claim for payment, as well as a false record or statement material to a false claim for payment. In addition, each invalid diagnosis code that the Defendants knowingly failed to delete constitutes an improperly avoided obligation to remit overpayments to CMS in violation of the FCA.

22.    Relator has standing to initiate a legal action on behalf of the United States to redress the wrongdoing alleged in this Complaint pursuant to the qui

7

tam provisions of the FCA. Relator brings the current action based on the FCA and seeks through this action to recover damages and civil penalties arising from the Defendants' knowing fraud on the United States.

## II.    Parties

23.    Plaintiff-Relator Karen Bowers is a former employee of both Viva and BCBS. At Viva, she worked as a Risk Adjustment Manager from November 2015 until May 27, 2022. At BCBS, she worked as a Risk Programs Manager for BCBS's MA plans from June 6, 2022 until November 16, 2022. She is an RHIA-certified coder and has a B.A. in Health Information Management. As part of her job duties with Viva, Relator was tasked with auditing providers with suspicious claims or coding practices to determine whether there was fraud, waste, or abuse. As part of her job duties at BCBS, she was tasked with analyzing risk adjustment analytics and ensuring the submission of risk adjustment codes to CMS. Relator discovered the misconduct described in this Complaint in the course of her duties at Viva and BCBS.

24.    The Complete Health Defendants in this action are a group of related entities that manage, operate, and fund the business known as "Complete Health." Complete Health is a primary care group that currently operates in Florida and Alabama with plans to expand throughout the Southeast.

25.    Defendant Pharos Capital Group, LLC is a physician-founded private equity firm that owns and operates Complete Health. Pharos founded Complete Health in 2018 after acquiring Ormond Medical Arts, a primary care practice in Daytona, FL.

26.    Complete Health is Pharos's primary care group "platform" investment, meaning that Pharos uses Complete Health as its vehicle to acquire and transform primary care practices.

8

27.     Pharos actively manages Complete Health and the primary care practices it acquires. On its website, Pharos states that its "philosophy" is to be a "value added partner with deep operating expertise in healthcare." It describes its participation in its portfolio companies, like Complete Health, as follows:

> The cornerstone of Pharos' investment strategy is to seek opportunities to add value beyond the dollars invested. We provide ongoing support and counsel to our portfolio companies through active board participation. This support may include locating, analyzing and negotiating acquisitions, financial modeling and budgeting assistance, negotiating key strategic agreements, recruiting management or additional healthcare providers, raising capital and, when necessary, developing strategies for corporate restructurings. Frequently, the experience and contacts of the firm in these areas will be complementary to a company's own strengths. We work closely with company management to formulate strategic plans and actively monitor performance through participation in the operational review process.
>
> Within our stated investment criteria, our investment approach contains a number of key tenets [including] [e]nhancing returns through creative financial structuring.

28.     Pharos has acquired Complete Health primary care practices primarily through two of its capital funds, Pharos III and Pharos III-A.

29.     Defendant Complete Health Partners, Inc., is a Delaware Corporation headquartered at 1301 Riverplace Blvd., Suite 1818, Jacksonville, FL 32207. It is an operating company of Pharos.

30.     Complete Health consists of many physician practice groups, including, among others: Advanced Family Medicine, LLC; Birmingham Internal Medicine Associates, LLC; Northside Medical Associates, LLC; and Ormond Medical Arts Family Practice, LLC. Complete Health has practices that together comprise at least 16 offices in Florida and Alabama, including offices in Ormond Beach, FL; South Daytona, FL; DeLand, FL; Orange City, FL; Edgewater, FL; Pell

9

City, AL; Moody, AL; Birmingham, AL; Springville, AL; Trussville, AL; Pinson, AL; and Adamsville, AL.

31.     Complete Health holds contracts with many MA plans, including the MAO Defendants. In Alabama, Complete Health's contracts include the following: Aetna Medicare Advantage Plan, Blue Cross Blue Shield Blue Advantage, Cigna Medicare Advantage (Formerly Healthspring), Humana Medicare Advantage plans, UHC Medicare Advantage plans, UMWA Retirement plan (United Mineworkers of America), and Viva Medicare Advantage.

32.     In Florida, Complete Health's MA plan contracts include Advent Health Advantage Plan (aka Sunsaver, aka Health First), Aetna Medicare Advantage Plan, AvMed Medicare Advantage Plan, Anthem Medicare Advantage, Optimum Medicare Advantage Plan, Freedom Medicare Advantage Plan, Cigna 5-Star Medicare Advantage Plan, Florida Blue PPO Medicare Advantage Plan, Humana Gold Plus HMO, and Humana Choice PPO.

33.     Viva Health, Inc. is an Alabama domestic corporation registered at 1222 14th Avenue South Birmingham, AL 35205, and headquartered at 417 20th Street North, Suite 1100, Birmingham, AL 35203. Viva is a health maintenance organization that at all relevant times has held contracts with Medicare and Alabama Medicaid, including contracts to operate MA plans.

34.     Blue Cross and Blue Shield of Alabama is an Alabama domestic non-profit corporation located at 450 Riverchase Parkway East, Birmingham, Alabama 35244. Like Viva, BCBS is a health maintenance organization that at all relevant times has held contracts with Medicare and Alabama Medicaid, including contracts to operate MA plans.

35.     Viva and BCBS both operate MA plans that contract with providers for primary care services, including Complete Health.

## III.   Jurisdiction and Venue

36.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

37.    Although the issue is no longer jurisdictional, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4). Moreover, Relator would qualify under that section as an "original source" of the information in this Complaint even had such a public disclosure occurred as she has direct and independent information that would materially add to any publicly disclosed allegations or transactions of fraud and she voluntarily provided this information to the Government before filing this Complaint.

38.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the Defendants can be found in and have transacted business in the Middle District of Florida.

39.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendants transact business and have committed acts proscribed by 31 U.S.C. § 3729 in this district.

## IV.   Statutory and Regulatory Background

### A.   The False Claims Act

40.    The FCA prohibits any person from knowingly making, or causing to be made, a false or fraudulent claim for payment to the United States. 31 U.S.C.

11

§ 3729(a)(1)(A). The FCA also prohibits knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

41.    A false or fraudulent claim under the FCA may take many forms, "the most common of which is a claim for payment for goods and services not provided or provided in violation of contract terms, specification, statute or regulation." False Claims Amendment Act of 1986, S. Rep. No. 99-345, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274. The terms "false or fraudulent" have the same meaning as under the common law and extend to misrepresentations by omission.

42.    The misrepresentation must be material, which the FCA defines to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

43.    The FCA defines knowingly to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. §3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

44.    Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the government.

45.    The FCA allows any person having information about false or fraudulent claims to bring an action for the person and the United States and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time).

## B.    The Medicare Program

46.    Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are

disabled, or who suffer from end stage renal disease. The Medicare program is administered through CMS.

47. The Medicare program has four parts: Part A, Part B, Part C, and Part D. Medicare Part A covers the cost of hospital services and post-hospital nursing facility care. Medicare Part B covers the cost of services performed by physicians and certain other healthcare providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing facilities.

48. Under Medicare Part C, Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in Medicare Advantage plans and receive healthcare services managed by those MA plans. MA plans must provide coverage for all the services Medicare beneficiaries are entitled to receive from the traditional Medicare Program. Anyone who is eligible for and enrolled in Medicare Parts A and B may elect to enroll in an MA plan offered in the service area in which he or she resides. There has been a steady increase in MA enrollment as a proportion of total Medicare enrollment from 2003, when approximately 13 percent of the Medicare population was enrolled in an MA plan, to the present, when nearly half of the Medicare population is enrolled in an MA plan.

49. Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug Plan ("PDP") or an MA plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C.

50. Under Medicare Parts A and B, CMS reimburses healthcare providers for covered services using a fee-for-service payment system, under which providers claim payment from CMS for the services they furnished to Medicare beneficiaries. CMS pays providers a predetermined rate for each

13

covered service, such as a physician office visit, outpatient procedure, or hospital stay.

51.    Under Medicare Parts C and D, CMS pays a prospective, monthly payment on behalf of each beneficiary enrolled in an MA plan or PDP. The prospective payments are known as "capitation" payments.

52.    The MA plan or PDP is responsible for reimbursing healthcare providers for covered services furnished for the plan's enrolled members. Each MA plan agrees to bear the risk that the amount that it pays providers for the health services for a particular beneficiary in one of its plans may exceed the amount that it was paid to insure the beneficiary.

### C.    Risk Adjustment

53.    CMS's capitation payments to MA plans are adjusted at the beneficiary level to account for the beneficiary's demographic and health risk, a process known as "risk adjustment."

54.    CMS calculates its monthly capitation payments to MA plans starting with a predetermined "base" amount. The base amount is unique for each plan and set using a number of factors, including the plan's annual bid and benefit package. The base amount is standard for all members enrolled in the plan.

55.    To calculate the monthly capitation payment for each enrolled beneficiary, CMS adjusts the base amount up or down based on the beneficiary's unique set of risk factors, such as age, gender, disability status, institutional status, and health status. Through these adjustments, CMS pays more for beneficiaries whose risk profile corresponds to higher healthcare costs and less for those whose profile corresponds to lower healthcare costs.

56.    Since 2004, CMS uses a statistical model, known as the Hierarchical Conditions Category ("HCC") model, to assign each beneficiary a "risk score" that

14

accounts for the beneficiary's demographic and health status. The risk score is a multiplier that is applied to the base amount CMS pays to the MA organization to determine the capitation payment. The higher a beneficiary's risk score, the higher the payments that CMS makes to MA Organizations for that beneficiary.

57.    A beneficiary's health status and therefore risk score is determined based on diagnoses recorded on professional, inpatient, and outpatient claims. When medical providers submit more risk-adjusting diagnosis codes, they increase the amount that CMS pays. Conversely, when providers delete risk-adjusting diagnosis codes (such as erroneous, invalid, unsupported, or otherwise false codes), they reduce the amount that CMS pays.

58.    The HCC model is prospective, meaning that it relies on diagnoses assigned to a beneficiary in the current year to determine the risk score for the beneficiary for the following year.

59.    The HCC model is regularly revised to more accurately assess beneficiary risk scores. For instance, in Payment Year ("PY") 2019, CMS implemented an HCC model that includes additional HCCs for chronic kidney disease, mental health, and substance use disorder. In PY 2020, CMS began to take into account the number of conditions a beneficiary has as part of the 21st Century Cures Act.

60.    The HCC model uses a classification system that categorizes approximately 72,000 ICD-10-CM diagnosis codes into approximately 1,500 diagnostic groups ("DXGs"), which are then grouped into 204 HCCs. Each code maps to exactly one DXG, which represents a well-specified medical condition. Each HCC is a category of clinically-related diagnoses. *See* 42 C.F.R. § 422.2. Not all HCCs are factored into CMS's risk adjustment payment model, as explained below.



[CMS, Report to Congress: Risk Adjustment
in Medicare Advantage (Dec. 2021)]

61.    HCCs are hierarchical: The diagnoses grouped into HCCs include major, severe, and/or chronic illnesses, and related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. For groups of related HCCs, HCCs are ranked so that the lower numbered HCCs are more severe than the higher numbered HCCs. A beneficiary's risk score includes only the most severe manifestation among related diseases. For instance, if a beneficiary has an ICD code that groups into HCC 86 (acute myocardial infarction, the most severe among related HCCs), that diagnosis supersedes any diagnosis the patient may receive corresponding to

16

HCCs 87 (unstable angina or other acute ischemic heart disease) and 88 (angina pectoris), which are less severe related HCCs.

62. Although HCCs reflect hierarchies among related disease categories, for unrelated diseases, HCCs accumulate. Hierarchies allow for payment based on the most serious conditions when less serious conditions also exist. For instance, a person with heart disease, stroke, and cancer has at least three separate HCCs coded, and the patient's predicted cost will reflect increments for all three problems.

63. The HCC model assigns a relative numerical value to each HCC that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category. It determines the relative values based on an analysis of the additional amounts that it paid on average for the treatment of these major, severe, and chronic medical conditions under Parts A and B of the Medicare Program. Higher relative values are assigned to HCCs that include diagnoses with greater disease severity and greater costs associated with their treatment.

64. The combination of the HCC values applicable to each beneficiary determines the beneficiary's risk score. The product of the base amount and the risk score yields the monthly capitation payment amount for the beneficiary.

65. Not all HCCs are factored into CMS's risk adjustment payment model. Currently, in model v24, CMS considers 86 of the 204 HCCs in making risk adjustment calculations.

66. For a medical condition to become part of the beneficiary's risk score, a qualified healthcare provider must diagnose the condition in the beneficiary's medical record. CMS will not adjust its payment based on a diagnosed condition if the beneficiary's medical record does not support the

17

Case 3:22-cv-00463-WWB-PDB   Document 19   Filed 03/10/23   Page 21 of 77 PageID 375

diagnosis. Medical providers (e.g., physicians or organizations that employ physicians) submit diagnosis codes to CMS, which uses the codes to determine a beneficiary's health status in order to calculate the beneficiary's risk score. These diagnosis codes, as reported by medical providers, are the only factors that CMS uses to determine a beneficiary's health status. CMS relies on these diagnosis codes to make accurate payments for each beneficiary enrolled in the Medicare Advantage program.

67.    Risk scores are calculated each year and health status does not carry over beyond the payment year unless the condition is diagnosed anew. Thus, if a beneficiary is diagnosed with diabetes in Year 1, the condition will become part of the beneficiary's risk score for Year 2. If the patient is not diagnosed with diabetes in Year 2, the condition will not be part of the beneficiary's risk score for Year 3.

68.    CMS calculates risk scores using diagnoses submitted by MAOs. CMS has used diagnoses submitted into CMS' Risk Adjustment Processing System ("RAPS") by Medicare Advantage organization and the Encounter Data System ("EDS"). Each RAPS and EDS submission must include the Medicare beneficiary's identification number (expressed as a HICN or Medicare Beneficiary Identifier); the date(s) of the medical encounter (the physician office visit, hospital outpatient visit, or hospital inpatient stay); the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter. The MAOs that contract with Complete Health submitted risk adjustment data through RAPS and EDS. The RAPS database also contained a field called a "delete indicator" that allowed MAOs and related entities to retract invalid diagnoses that they previously submitted. Similarly, MAOs could retract invalid diagnoses from EDS by submitting a delete record, a replacement

encounter data record with the unsupported diagnoses removed, or by voiding the encounter data record.

69.    Providers provide encounter data to MAOs (who then submit that data to CMS for risk adjustment purposes) by filing electronic claims in a CMS-standardized electronic claim format, the X12 837 5010 format.

### D.    CMS's Contracts with MAOs

70.    To qualify as an MAO, enroll beneficiaries in an MA plan, and be paid on behalf of those enrolled beneficiaries, an insurance company must enter into a contract with CMS. 42 C.F.R. § 422.503(a). In its contract, the MAO agrees to comply with requirements set forth in the Medicare statute and regulations, as well as in CMS instructions, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, the Risk Adjustment Participant Guides, and Medicare Advantage operating instructions. 42 C.F.R. § 422.504(a). MAOs must additionally agree to comply with the FCA. 42 C.F.R. § 422.504(h).

71.    MAOs must agree that their contracts or written arrangements with first-tier, downstream, and related entities will contain certain provisions, including a provision that any services or other activity the entity performs in accordance with a contract will be consistent and comply with the MAO's contractual obligations to CMS. 42 C.F.R. § 422.504(i)(3)(iii).

72.    "Related Entities" include those entities that are related to an MAO by common ownership or control and perform at least some of the MAO's management functions. 42 C.F.R. §§ 422.2 & 422.500.

73.    "First Tier Entities" include those providers or provider groups that enter into a written arrangement with an MAO to provide healthcare services to the beneficiaries enrolled in the MA Organization's plans. 42 C.F.R. §§ 422.2 & 422.500.

19

74. "Downstream" entities include any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MAO (or applicant) and a first-tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services. 42 C.F.R. §§ 422.2 & 422.500.

75. If an MAO delegates any of its activities or responsibilities to a related, first-tier, or downstream entity, that entity must agree to comply with all applicable Medicare laws, regulations, and CMS instructions. 42 C.F.R. § 422.504(i)(5). Notwithstanding any arrangement it makes with a first-tier or downstream entity, the MAO remains responsible for complying with all terms and conditions of its contracts with CMS. 42 C.F.R. § 422.504(i)(1).

76. On information and belief, at all relevant times, each of the MAOs that contracted with Complete Health have held contracts with CMS incorporating the requirements set forth in 42 C.F.R. § 422.504. Complete Health qualifies as a First-Tier Entity and/or Downstream entity within the meaning of 42 C.F.R. §§ 422.2 and 422.500.

77. As a condition for receiving a monthly payment, the MAO must request payment on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests. 42 C.F.R. § 422.504(l). Among other things, the MAO must certify (based on best information, knowledge, and belief) that the data it submits under 42 C.F.R. § 422.310, relating to risk adjustment data, are accurate, complete, and truthful. 42 C.F.R. § 422.504(l)(2). If such data are generated by a related entity, contractor, or subcontractor, that entity must similarly certify

(based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data. 42 C.F.R. § 422.504(l)(3).

78. The MAO must further certify that the information provided for purposes of reporting and returning overpayments under 42 C.F.R. § 422.326 is accurate, complete, and truthful. 42 C.F.R. § 422.504(l)(5).

79. Each contract and certification must be signed annually by a senior executive of the MAO, such as the MAO's CEO or CFO.

80. In addition, MAOs are required to execute Electronic Data Interchange ("EDI") agreements prior to submitting risk adjustment data (CMS-10340). In the EDI agreements, MAOs attest to the accuracy of the risk adjustment data they submitted. By executing EDI agreements, the MAOs agree that (i) they will be responsible for all risk adjustment data submitted to CMS by themselves, their employees, and their agents; (ii) they will submit risk adjustment data that is accurate, complete, and truthful based on best knowledge, information, and belief; (iii) they will research and correct risk adjustment data discrepancies; and (iv) CMS has the right to audit and confirm the risk adjustment data, including diagnoses, submitted by the MAO and the right to access the beneficiaries' medical records to conduct such audits.

81. At all relevant times, each of the MAOs that contracted with Complete Health have made the certifications required under 42 C.F.R. § 422.504 to CMS. Each of the MAOs has additionally executed an EDI agreement with CMS.

E. **Complete Health's Contracts with MAOs**

82. Complete Health operates under contracts it holds with health plans, including MA Plans. In a typical arrangement, Complete Health is a provider within the health plan's provider network and available for patients' primary care

21

services. Complete Health currently contracts with dozens of health plans, including the MAO Defendants.

83.     Complete Health's contracts with health plans are based on an at-risk model. In an at-risk model, a provider's reimbursement is tied to the MAO's, aligning their incentives and ensuring the provider shares the risk of its patients' healthcare. If the MAO receives more money for patients from CMS, the provider receives more money from the MAO. If the MAO receives less money for patients from CMS, then the provider receives less money from the MAO.

84.     While Complete Health's arrangements vary by plan, Complete Health's MAO contracts incentivize it to increase MA plans' revenue associated with its enrolled patients.

85.     For example, Complete Health has an at-risk contract with Viva relating to one of its Birmingham locations ("Birmingham Contract"). That contract was signed by Brad Rollow of Viva and Jeff Preuss of "Birmingham Internal Medicine Associates d/b/a Complete Health," effective January 1, 2021. On information and belief, this contract is representative of Complete Health's contracts with many other MAOs.[1]

86.     The Birmingham Contract requires Complete Health to certify its compliance with CMS rules and regulations. It also requires Complete Health to provide "Covered Services ... in accordance with the terms and conditions of [Viva's] Medicare Advantage contract with CMS" and that the determination of Covered Services is "governed by the Medicare Advantage benefit program and coverage guidelines established by CMS."

---

[1] Even where Complete Health lacks an at-risk contract with an MAO, its fraudulent risk adjustment scores are still submitted to CMS and still cause CMS to overpay.

87.   The Birmingham Contract compensates Complete Health with a base capitation payment of $75 per member per month. This capitation payment is subject to "adjustments" relating to "Medicare Advantage Revenue" paid to Viva. These adjustments enable Complete Health to receive approximately 85% of Viva's Medicare Advantage Revenue, subject to various adjustments, including performance bonuses.

88.   "Medicare Advantage Revenue" is defined as Part C revenue CMS pays to Viva and includes "any Risk-Adjustment/Demographic Factor that is applied on a member-specific basis and any retroactive Risk-Adjustment/Demographic Factor payments received by [Viva]." Medicare Advantage Revenue is also adjusted based on any "recoupment activity … initiated by CMS or the OIG related to retrospective risk adjustment validation audits" for a six-year period. Accordingly, the base capitation rate Viva pays to Complete Health under its at-risk contract is adjusted upward to account for patients' risk adjustment scores.

89.   The Birmingham Contract requires Complete Health to submit "encounter data for medically necessary primary care services" including "diagnostic code[s]" in a "CMS approved format or any other format as approved by [Viva]." It also provides that encounter data "must be supported by proper authorization."

90.   These compensation terms incentivize Complete Health to maximize the capitation payments CMS pays for Complete Health patients and minimize those patients' healthcare costs.

91.   As alleged in this Complaint, one of the ways that Complete Health maximizes capitation payments is by generating invalid and improper diagnosis codes. Complete Health uses this coding to cause CMS to pay higher capitation

23

payments to the MAO Defendants and other MA plans through its risk-adjustment process. Complete Health benefits from these higher capitation payments through its at-risk contracts, which, for example, in the case of its contracts with Viva, entitles it to approximately 85% of Viva's capitation revenue.

**F.    CMS Requires MAOs and Downstream Providers to Ensure that the Diagnoses They Submit Meet CMS's Requirements**

92.    Pursuant to its regulations and contracts with MAOs, CMS has issued instructions to MAOs governing the risk adjustment data they submit for MA plans. The instructions extend to downstream entities such as Complete Health, as explained above. Compliance with the instructions is material to CMS's decision to pay the MAO based on the risk adjustment data it submits.

93.    Among the requirements an MAO must follow, the MAO must ensure that all diagnoses it submits are documented in the patient's medical record and resulted from a visit with a qualified healthcare provider. *See* CMS, Medicare Managed Care Manual Ch. 7 § 40 (Sept. 19, 2014).

94.    At all relevant times, CMS has required MAOs to submit risk adjustment diagnoses that are substantiated in and supported by the patient's medical record documentation. Medicare Managed Care Manual Ch. 7 § 130; CMS, 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 Participant Guide") § 7.1.1.

95.    CMS requires MAOs to submit diagnosis coded in accordance with the International Classification of Diseases, Clinical Modification ("ICD-10-CM"), including The Official ICD-10-CM Guidelines for Coding and Reporting (the "ICD-10-CM Guidelines"). 42 U.S.C. 1320d-2(c); 45 C.F.R. § 162.1002(c)(2).

96.    ICD-10-CM Guidelines prohibit the coding of a diagnosis if the provider documented the condition as merely probable, suspected, questionable,

or as something the provider intended to rule out. ICD-10-CM Guidelines § IV.H; *see also* 2008 Participant Guide § 7.2.4 ("'Probable,' 'suspected,' 'questionable,' 'rule out,' or 'working' diagnoses cannot be reported to CMS as valid diagnoses by a physician.").

97.   MAOs, like the MAO Defendants, are responsible for designing and implementing systems to monitor the risk adjustment data they submit and ensure that such data are accurate, complete, and truthful. 42 C.F.R. § 422.504(l); Medicare Managed Care Manual Ch. 7 § 40.

98.   If the MAO determines that any diagnosis code it submitted does not meet risk adjustment submission requirements, it is responsible for deleting the submitted diagnosis code within 60 days of identification. 42 C.F.R. § 422.326(b).

## V.   <u>Allegations</u>

99.   This case involves two related fraudulent schemes. First, the Complete Health Defendants knowingly submit and have submitted false and fraudulent diagnosis codes to MA plans—including MA plans operated by the MAO Defendants—to increase its reimbursement. The MAO Defendants know that Complete Health is submitting, and has submitted, false and fraudulent diagnosis codes for reimbursement, but continue to submit and refuse to delete such codes. Second, BCBS implemented an incentive program that pushed all of its providers—including non-Complete Health providers—to diagnose as many risk adjustment codes as possible—even when providers had no expertise to diagnose the condition or otherwise had reason to believe the risk adjustment codes were inaccurate or unsupported. In many instances, the providers did not treat or provide any management or care services for the purported condition.

25

100.    Complete Health is a large and growing group of primary care practices based in Jacksonville, Florida. As described below, Complete Health knowingly submits codes for conditions that its patients do not have or that are not documented in the patient's medical record. The incorrect and unsupported codes have resulted in millions of dollars in overpayments from CMS to MA plans. Much of the overpayments flow to Complete Health, whose compensation is based in part on the revenue the MA plans generate from its patients. The driving force behind Complete Health is Pharos, which operates and manages Complete Health and knows, has recklessly disregarded, or has been deliberately ignorant of the truth that Complete Health has been submitting false diagnosis codes to increase its revenue.

101.    Despite direct warnings about its practices, Complete Health and Pharos have not changed their coding practices or deleted the thousands of false diagnosis codes Complete Health has submitted. Complete Health's patients therefore continue to be saddled with diagnoses for serious conditions they do not have and/or for which they are not receiving treatment, all for the sake of profits.

102.    The MAO Defendants contribute to Complete Health's fraud by allowing Complete Health to submit and continue submitting diagnosis codes that the MAO Defendants know to be false—despite CMS rules requiring the MAO Defendants to report the false diagnosis codes and return overpayments associated with them.

103.    Similarly, BCBS has engaged in a pattern and practice of permitting and incentivizing providers to submit false risk adjustment diagnosis codes.

104.    BCBS encouraged providers to submit false risk adjustment diagnosis codes through a fraudulent incentive scheme by which providers were

26

paid additional amounts per member per month based on hitting certain risk adjustment coding benchmarks. The more risk adjustment codes providers coded to their patients, the more incentive payments they received from BCBS.

## A.    Fraud Related to Complete Health's Coding Practices

### 1.    *Complete Health Submits False Diagnosis Codes to MA Plans In Order to Claim Higher Reimbursement from CMS*

105.    Complete Health uses coders to add diagnosis codes to patient records to increase the capitation payment CMS pays for its patients. Complete Health adds improper diagnosis codes to patient encounter data, which it then submits to MAOs for risk adjustment payments. The MAO Defendants know that Complete Health's encounter data include improper diagnosis codes but continue to submit the data and refuse to delete the improper codes as required.

106.    When Complete Health takes over a practice, it quickly transforms the practice's coding. As a consequence, practices acquired by Complete Health see a surge in diagnosis codes, most of which are improper, making it appear to CMS that these practices' patients are suddenly far sicker and far riskier than they were pre-acquisition.

107.    Most of the incorrect and unsupported diagnosis codes that Complete Health submits to MA plans originate with coders whose job is to scour patient medical records and insert new diagnosis codes that will increase Complete Health's reimbursement. Complete Health's coders are located at its headquarters in Jacksonville, Florida but add conditions to the medical records of patients located throughout its system.

108.    Complete Health's coders add codes to patient medical records both retrospectively and prospectively. For the retrospective additions, the coders have

27

added diagnosis codes to encounters that took place prior to Complete Health's acquisition of physician practices, with Complete Health submitting the additional diagnoses to MA plans like the MAO Defendants. For the prospective additions, Complete Health's coders add diagnosis codes to patients' Problems Lists ahead of upcoming encounters, with the expectation that those codes will be sent to an MA plan following the encounter.

109.   In many instances, Complete Health coders place invalid diagnosis codes into the "Problems List" section of a patient's medical record shortly before a patient encounter. It is highly unusual for coders—as opposed to doctors and nurses—to enter information directly into a patient's medical record, especially when that information is a purported diagnosis.

110.   The information the coders add to the Problems List is intended expressly to increase Complete Health's reimbursement and includes fictional details that do not reflect the patient's clinical history. The entries typically include the diagnosis code, an onset date, an "*HCC*" designation (signaling that the code will increase revenue), and sometimes additional information (e.g., "Opioid dependence – Onset: 10/13/2020 – *HCC* F11.20 Norco [i.e., the name of the opioid]"). The onset dates are often arbitrary: In many cases, they reflect the date of the patient's next office visit. Complete Health's Electronic Medical Record ("EMR") system, AthenaHealth, records the initials of the coders and the date those coders added the diagnosis codes to the Problems List section.

111.   After a patient encounter is finished, the codes added by Complete Health are usually populated into the "Assessment/Plan" section of the patient's medical records and become part of the encounter data that Complete Health submits to MA plans.

112.   Complete Health's emphasis on documenting as many diagnoses as possible has generated a large number of false diagnosis codes that either do not correspond to the patient's condition or lack supporting documentation in the patient's medical record. As discussed below, Complete Health's diagnosis codes routinely do not meet CMS statutory, regulatory, and/or contractual requirements for risk adjustment data and are therefore false claims for payment under the FCA. Three conditions in particular—opioid dependence, sedative dependence, and senile purpura—are widely diagnosed despite having no support in the patients' medical record or any evidence that the patients are being treated for the conditions. But Complete Health's upcoding extends to multiple other conditions, including but not limited to diabetic complications.

113.   Complete Health often adds invalid diagnosis codes in a manner that results in those codes appearing on the "Assessment/Plan" section of patients' medical records. This section of the medical record is included in the claim that is submitted to CMS and used for risk adjustment payment purposes. Accordingly, diagnosis codes added by Complete Health are submitted to CMS for risk adjustment payment purposes—even if other portions of the patient's medical records, which are not provided to CMS, contradict the diagnosis code.

     i.     *Complete Health Has Submitted False Diagnosis Codes for Multiple Conditions*

Substance Use Disorder

114.   Two of the most common diagnosis codes improperly added by Complete Health are F1120, opioid dependence, and F1320, sedative, hypnotic or anxiolytic dependence.

115.   As to opioid dependence, the ICD-10-CM standard includes many codes relating to the use of opioids. These codes correspond with opioid "use,"

"abuse," and "dependence." The opioid ICD-10-CM codes are assigned to three HCC hierarchical codes: HCC 54, 55, and 56. The codes are numbered in reverse order of severity: HCC 56 is the least severe and HCC 54 is the most severe. Of the three, only HCCs 55 and 54 have assigned risk scores. The ICD-10-CM code F1120, opioid dependence, is assigned to HCC 55 and therefore affects CMS risk scores and payment. The ICD-10-CM code F1110, opioid abuse, uncomplicated, is assigned to HCC 56 and does not affect CMS risk scores and payment.

116.   The accepted standard of medical practice for diagnosing opioid use disorder is set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). DSM-5 sets forth diagnostic criteria for opioid use disorder:

- Opioids are often taken in larger amounts or over a longer period than was intended;

- There is a persistent desire or unsuccessful efforts to cut down or control opioid use;

- A great deal of time is spent in activities necessary to obtain the opioid, use the opioid, or recover from its effects;

- Craving, or a strong desire or urge to use opioids;

- Recurrent opioid use resulting in a failure to fulfill major role obligations at work, school, or home;

- Continued opioid use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of opioids;

- Important social, occupational or recreational activities are given up or reduced because of opioid use;

- Recurrent opioid use in situations in which it is physically hazardous;

- Continued use despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by opioids;

- Tolerance, as defined by either of the following: (a) a need for markedly increased amounts of opioids to achieve intoxication

or desired effect; or (b) markedly diminished effect with continued use of the same amount of an opioid; and

- Withdrawal, as manifested by either of the following: (a) the characteristic opioid withdrawal syndrome; or (b) the same (or a closely related) substance are taken to relieve or avoid withdrawal symptoms.

A patient does not meet the last two factors, tolerance and withdrawal, if he or she is taking opioids solely under appropriate medical supervision.

117. Under DSM-5, a patient who manifests 2–3 of the diagnostic criteria has "mild" opioid use disorder, which corresponds to the ICD-10-CM codes for opioid abuse (F1110). A patient who manifests 4–5 criteria has "moderate" opioid use disorder corresponding to the ICD-10-CM codes for opioid dependence (F1120); and a patient who manifests six or more criteria has "severe" opioid use disorder, also corresponding to the ICD-10-CM codes for opioid dependence (F1120). A patient who manifests fewer than 2 of the diagnostic criteria does not have an opioid use disorder.

118. As to sedative dependence, the ICD-10-CM standard also includes codes corresponding with sedative "use," "abuse," and "dependence." Like opioids, ICD-10-CM codes relating to sedatives are assigned to HCC codes 54, 55, and 56. The ICD-10-CM code F1320, sedative, hypnotic or anxiolytic dependence, uncomplicated, is assigned to HCC 55 and therefore affects CMS risk scores and payment.

119. The accepted standard of medical practice for diagnosing sedative use disorder is the DSM-5 diagnostic criteria. The diagnostic criteria for sedative use disorder mirrors that of opioid use disorder. A new diagnosis requires at least two of the DSM-5 criteria. The disorder is mild if 2–3 criteria are met, moderate if 4–5 are present, and severe with 6–7 or more.

31

120.    Since its founding, Complete Health has diagnosed its patients with opioid and sedative dependence based solely on their patients having valid prescriptions of opioids and sedatives, whether or not the patients manifested any symptoms associated with a substance abuse disorder. The definitions of opioid or sedative use disorder under DSM-5 do not permit providers to diagnose patients with dependence (F1120 or F1320) simply by virtue of the patient having a prescription for an opioid or sedative. Based on its invalid diagnoses, Complete Health has submitted false diagnosis codes for opioid and sedative disorders to MAOs, which submitted those claims to CMS for payment.

121.    Relator, in the course of her employment at Viva, reviewed numerous medical records in which Complete Health submitted an F1120 or F1320 diagnosis code to Viva based on a patient encounter in which the doctor ruled out the condition, found no symptoms necessary to diagnose the condition, or documented no findings at all.

122.    For example, Complete Health submitted an F1120 diagnosis code to Viva following a January 15, 2021 encounter with Patient 4276.[2] The sole basis for the diagnosis code is the patient's Problems List, which states "Opioid dependence - Onset: 07/13/2020 - *HCC* F11.20 Norco." The patient's medical records, however, contain no information that would support a diagnosis of opioid use disorder. The patient's medication list indicates that Patient 4276 was prescribed an opioid (Norco, 10 mg/acetaminophen 325 mg) on January 1, 2021. The Assessment/Plan section of Patient 4276's medical records also state that Patient 4276 uses opioids for his "chronic pain syndrome" and that Patient 4276 is "stable on [his] current regimen." The "Review of Systems" section of Patient

_____

[2] This Complaint uses random identifiers in place of patient names to comply with the Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d *et seq.*

32

4276's medical records indicates that he suffers from back and joint pain. There is no indication that Patient 4276 meets any of the criteria for opioid dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for opioid dependence. The mere fact that an opioid is prescribed to treat a patient's chronic pain does not warrant a diagnosis of opioid dependence.

123.   Similarly, Complete Health also submitted an F1320 diagnosis code to Viva for Patient 4276. As with opioid dependence, the basis for the diagnosis code is an entry on the patient's Problems List stating: "Benzodiazepine dependence - Onset: 10/15/2020 - *HCC* F13.20 Alprazolam." (It also includes an entry, without an HCC code, for "Sedative dependence - Onset: 10/16/2020."). There is no other indication in the patient's medical records that supports a diagnosis of sedative dependence, however. The patient's medication list indicates that Patient 4276 refilled a prescription for Alprazolam on December 23, 2020. The Assessment/Plan section of Patient 4276's medical records states that, with respect to Patient 4276's use of sedatives, he is "stable on [his] current regimen." There is no indication that Patient 4276 meets any of the criteria for sedative dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for sedative dependence. The mere fact that a sedative is prescribed does not warrant a diagnosis of sedative dependence.

124.   In a number of cases, the provider's notes document opioid or sedative use but expressly rule out dependence or abuse by noting the patient is "stable" on their current regimen, directly contradicting the diagnosis code that Complete Health submitted. In other cases, the provider's notes state that the patient is taking opioids or sedatives without manifesting any symptoms

33

associated with dependence. For those encounters, the medical record does not support the F1120 or F1320 diagnosis because the provider observed no symptoms associated with dependence or abuse. In still other cases, the provider's notes include no information supporting the ICD-10-CM diagnosis code. For those encounters, the F1120 or F1320 diagnosis code was not documented in a medical record as required by CMS regulations.

125.   Complete Health's diagnoses caused CMS to make significant payments to MA plans, including the MAO Defendants. Each unique HCC 55 diagnosis in a given patient was worth potentially thousands of dollars in annual capitation revenue, with the precise amount depending on the MA plan's payment rate and the patient's Medicare coverage status (i.e., aged, disabled, dually eligible for Medicaid, or institutionalized). Based on the number of diagnosis codes Complete Health submitted to the MAO Defendants alone, Relator has information and believes that Complete Health has submitted at least thousands of such diagnoses to MA plans for payment.

126.   More often than not, Complete Health's F1120 or F1320 diagnosis code was the only diagnosis the patient received for substance abuse or dependence in a given year, making Complete Health's diagnosis code the only basis for CMS paying the health plan for an HCC 55 code.

127.   Moreover, there is often no evidence in the medical records that the patients that Complete Health has diagnosed with opioid or sedative use disorder were being treated for those serious conditions. If the patients had truly met the criteria for a substance use disorder, Complete Health or another provider would have ordered treatment, not simply allowed the patient to continue taking the opioid and/or sedative in question.

128.   In 2021, Viva audited a sample of the diagnosis codes that Complete Health had submitted and concluded that a high percentage of them were incorrect or unsupported. Among its findings, Viva's audit revealed that Complete Health diagnosed numerous patients with opioid and sedative dependence once it took over a provider's practice. Those patients had never received an opioid or sedative dependence diagnosis before, and no other non-Complete Health provider diagnosed those patients with opioid dependence over the same time period—even when those patients saw other providers.

<u>Senile Purpura</u>

129.   The single most common diagnosis code that Complete Health has added to the medical records of Viva members is D692, other nonthrombocytopenic purpura ("senile purpura").

130.   The HCC model assigns a risk score to senile purpura, which is an age-related condition that causes benign, easy bruising due to fragile skin and blood vessels. It affects approximately 10 percent of adults over age 50.

131.   Symptoms of senile purpura include: (1) large, flat, and irregularly shaped red or purpose bruises; (2) thin skin; (3) loose skin without elasticity; (4) easily torn skin; and (5) occurrence of bruising without a related injury. Senile purpura is appropriately diagnosed only where the patient currently exhibits these symptoms.

132.   Complete Health, however, employs its coders to add D692 to many patients based on age alone or to patients who select "bruises easily" on patient questionnaires. "Bruising easily," however, can have many causes—such as the presence of a blood thinner for high blood pressure—and is not sufficient to clinically diagnose senile purpura.

35

133.    As an example, Complete Health submitted a D692 diagnosis code to Viva for Patient 4276 for the same January 15, 2021 encounter at which it had diagnosed him with both opioid and sedative dependence. The Problems List section of Patient 4276's medical records states "Senile purpura - Onset: 10/15/2020 - *HCC* D69.2," but the only information in the medical records that provides any support for the diagnoses is the patient's self-questionnaire, which states that the patient "bruises easily." There is no other indication of senile purpura. Indeed, the Review of Systems section also indicates that the patient reported "no bruising" and the Physician Exam section indicates that the patient's skin had "no rash, lesions or ulcer" upon inspection and palpitation. Nor is there any record that the patient's provider ordered any treatment for the condition. The mere fact that the patient self-identified as bruising easily is not sufficient to support a diagnosis of senile purpura.

134.    Complete Health is commonly the sole source of its patients' senile purpura diagnoses. In most instances, there is no evidence in the medical records that Complete Health or any other provider is treating the patients for the condition.

135.    Viva's 2021 audit concluded that a high percentage of Complete Health's D692 diagnosis codes were incorrect or unsupported. Among its findings, Viva's audit revealed that Complete Health diagnosed hundreds of patients with senile purpura once it took over a provider's practice. Those patients had never received a senile purpura diagnosis before, and no other non-Complete Health provider diagnosed those patients with senile purpura over the same time period—even when those patients saw other providers.

36

136.  Based on the number of codes submitted to Viva, Relator has information and believes that Complete Health has submitted at least thousands of senile purpura diagnoses to MA plans for payment.

Other Conditions

137.  Complete Health has improperly added diagnosis codes relating to many other high-revenue conditions, including diabetes with acute complications and major depressive disorder.

138.  For example, Complete Health often "links" its patients' diabetes diagnoses with other, unrelated conditions to increase patient risk scores and increase capitation payments from CMS. Under the HCC model, diabetes without complications (HCC 19) carries a lower risk score than diabetes with chronic, non-acute complications (HCC 18) or diabetes with acute complications (HCC 17). Thus, a patient diagnosed with diabetes that has caused acute complications, such as diabetes with renal or ocular manifestations, will have a higher risk score than a patient diagnosed with well-controlled diabetes.

139.  Complete Health has improperly diagnosed many patients with diabetic complications when none are evident in the patients' medical records. To do so, Complete Health "links" the patient's diabetes diagnosis to another condition in the patient's medical record, treating the former as the cause of the latter even though the patient's provider made no such finding. Complete Health's practice of linking unrelated conditions to patient's diabetes enables Complete Health to improperly code patients for higher severity diabetes HCCs (particularly HCC 18 instead of HCC 19), increasing its patient risk scores and CMS's capitation payments for those patients.

140.  Three of the most common diagnosis codes Complete Health adds to its claims are E118 (Type 2 diabetes mellitus with unspecified complications,

HCC 18), E1169 (Type 2 diabetes mellitus with other specified complication, HCC 18), and E1165 (Type 2 diabetes mellitus with hyperglycemia, HCC 18).

141.   Complete Health's linking of patients' unrelated conditions to diabetes is not clinically justified and done solely for the purpose of increasing its patient's risk scores.

142.   For example, Complete Health submitted an E118 diagnosis code to Viva for Patient 6718 relating to an encounter on February 9, 2021. Viva's audit notes stated that there was no physician documentation in the patient's medical records indicating a complication linked to diabetes.

143.   Similarly, another common diagnosis code added by Complete Health is F330, major depressive disorder, recurrent, which currently corresponds to HCC 59.

144.   The accepted standard of medical practice for diagnosing major depressive disorder is the DSM-5. At Complete Health, providers perform behavioral health risk assessments ("BHRA") to screen for major depressive disorder under the DSM-5 criteria. In many cases, however, Complete Health's provider performed a BHRA screening for major depression and recorded a negative result, yet Complete Health diagnosed the patient with major depression nonetheless.

145.   For most of the high-revenue diagnosis codes Complete Health adds, Complete Health is usually the only healthcare provider to diagnose its patients with the particular condition in a given year, even though its patients usually see other, non-Complete Health providers each year. For example, Viva found over 3,000 diagnosis codes that Complete Health added to its patient's medical records that were not coded by any other providers, and Complete Health/Viva deleted approximately half of those.

146.    In some cases, Complete Health is the sole source for acute diagnosis codes, like metastatic cancer, for which it is implausible that Complete Health, a primary care practice, was the only provider to diagnose the patient. For instance, Complete Health diagnosed Patient 0348 with HCC 2, meningococcemia, a rare, life-threatening infectious disease in 2020. No other provider diagnosed Patient 0348 with meningococcemia that year.

> ii.    *Complete Health's Fraud is Part of a Scheme to Increase CMS's Risk Adjustment Payments for its Patients*

147.    Complete Health's unlawful scheme is reflected in the sudden, steep increase in diagnoses for risk-adjusted conditions that its providers generated shortly after joining Complete Health.

148.    For example, Viva analyzed a subset of 23 providers from 2019–2021. Over that time period, these providers joined or were acquired by Complete Health.

149.    Viva found that once these providers were part of Complete Health, they diagnosed dramatically more high-revenue diagnosis codes. For example:

- Opioid dependence (F1120): Diagnoses increased from 217 in 2019 to 576 in 2021.

- Sedative dependence (F1320): Diagnoses increased from 14 in 2019 to 278 in 2021.

- Senile purpura (D692): Diagnoses increased from 40 in 2019 to 901 in 2021.

- Linked diabetes codes (E118, E1165, E1165): Diagnoses increased from 511 in 2019 to 2,347 in 2021.

150.    In most instances, providers did not diagnose these conditions prior to joining Complete Health and did not provide any treatment for these purported conditions after Complete Health had diagnosed them. In addition, in

39

nearly all instances, Complete Health providers were the only providers to diagnose these conditions for these particular patients. Accordingly, Complete Health was the sole source of the diagnoses increasing these patients' risk scores.

151. Providers' rapid increase in high-revenue diagnosis codes is a result of Complete Health's efforts to increase risk adjustment premiums through its practice of unsubstantiated and clinically inappropriate coding. It is not primarily the result of increasing patient volume or other factors.

152. Despite Viva's findings of Complete Health's risk adjustment coding practices, and warnings by Relator and others that the risk adjustment coding was fraudulent, Viva did not report the fraudulent coding, and other than the codes deleted from its initial audit, did not investigate or return overpayments associated with Complete Health's coding practices.

<em>iii.     Examples of Complete Health's Improper Diagnosis Codes</em>

153. The patients below are Medicare beneficiaries who were included in Viva's audit of Complete Health patients. Although Viva deleted the invalid diagnosis codes from the risk adjustment data it had submitted to CMS, these patient examples are representative of Complete Health's misconduct, which is not limited to patients of Viva or to the audit sample. Complete Health is engaging in improper coding with respect to numerous other patients and many other plans (including the MAO Defendants) and has neither stopped its practices or deleted the improper diagnosis codes it has submitted. In addition, Viva is no longer auditing Complete Health—indeed Viva prematurely terminated its initial audit after finding thousands of false diagnosis codes—even though Viva knows hundreds or even thousands of other Complete Health patients have false diagnosis codes that were reported to and are continuing to be reported to CMS.

40

<u>Patient 3554</u>

154.   Patient 3554 presented to Northside Medical Associates, a Complete Health practice, on October 13, 2020 complaining of "[r]ight shoulder pain, right foot pain, hip pain." The Assessment/Plan and Problems List sections of Patient 3554's medical records include diagnosis codes for opioid dependence (F1120). Patient 3554's Assessment/Plan section also included senile purpura (D692), which Viva later submitted to CMS for payment. The diagnosis codes are not clinically supported, however.

155.   As to opioid dependence, the Problems List section of Patient 3554's medical records states "Opioid dependence - Onset: 10/13/2020 - *HCC* F11.20 Norco." There is no other indication in the patient's medical records that supports a diagnosis of opioid dependence. Patient 3554's History of Present Illness section indicates that the patient was presenting to the clinic for foot, hip, and shoulder pain; was waiting to receive a foot surgery; had recently went to the ER because of her pain; and was in a motor vehicle accident that caused her shoulder pain. The patient's medication list indicates that Patient 3554 was prescribed an opioid (Norco, 7.5 mg/acetaminophen 325-mg) on October 13, 2020—the same day as her diagnoses for opioid dependence. There is no indication that Patient 3554 meets any of the criteria for opioid dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for opioid dependence. The mere fact that an opioid is prescribed to treat a patient's chronic pain does not warrant a diagnosis of opioid dependence.

156.   As to senile purpura, the Assessment/Plan section of Patient 3554's medical records includes a D692 diagnosis code for purpura but there is no information in the patient's medical records that supports that diagnosis. The

Physician Exam section indicates that the patient's skin had "no rash, lesions or ulcer" upon inspection and palpitation and had "good turgor."

Patient 8116

157.    Patient 8116 presented to Northside Medical Associates, a Complete Health practice, on February 9, 2021 complaining of "insomnia, hypertension." The Assessment/Plan and Problems List sections of Patient 8116's medical records include diagnosis codes for benzodiazepine dependence (F1320) and senile purpura (D692), which Viva later submitted to CMS for payment. The diagnosis codes are not clinically supported.

158.    As to sedative dependence, the Problems List section of Patient 8116's medical records states "Sedative dependence - Onset: 01/21/2021 - *HCC* F13.20 Temazepam." There is no other indication in the patient's medical records that supports a diagnosis of sedative dependence. The patient's medication list indicates that Patient 8116 was prescribed Restoril (the brand name of Temazepam) on February 9, 2021. The Assessment/Plan section of Patient 8116's medical records states, with respect to Patient 8116's use of sedatives, "Insomnia - Will discontinue Trazadone, Lorazepam and Doxepin. Will start Restoril therapy as ordered." There is no indication that Patient 8116 meets any of the criteria for sedative dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for sedative dependence. The mere fact that a sedative is prescribed for insomnia does not warrant a diagnosis of sedative dependence, particularly where the patient is taking the drug "as ordered."

159.    As to senile purpura, the Problems List section of Patient 8116's medical records states "Senile purpura - Onset: 01/21/2021 - *HCC* D69.2 by Stephen Fortson, MD, 07/21/2020." There is no clinical indication in the

42

patient's medical records that supports a diagnosis of senile purpura. Indeed, the Review of Systems section also indicates that the patient reported "no bruising" and the Physician Exam section indicates that the patient's skin had "no rash, lesions or ulcer" upon inspection and palpitation.

160.   Notably, Patient 8116 is listed on a spreadsheet Viva created (the "Audit Analysis Spreadsheet") as part of its audit of Complete Health members. The entry for Patient 8116 states "Delete sedative dependence, used for insomnia." Viva provided the spreadsheet to Complete Health following the audit.

Patient 9426

161.   Patient 9426 presented to Northside Medical Associates, a Complete Health practice, on March 4, 2021 for his six-month check-up and annual wellness visit. The Assessment/Plan and Problems List sections of Patient 9426's medical records include unsupported diagnosis codes for benzodiazepine dependence (F1320) and senile purpura (D692), which Viva later submitted to CMS for payment.

162.   For sedative dependence, the Problems List section of Patient 9426's medical records states "Sedative dependence - Onset: 02/25/2021 - *HCC* F13.20-Temazepam." There is no other indication in the patient's medical records that supports a diagnosis of sedative dependence. The patient's medication list indicates that Patient 9426 was prescribed Temazepam on March 4, 2021. The Assessment/Plan section of Patient 9426's medical records states that the patient takes Temazepam for her hypertensive disorder. There is no indication that Patient 9426 meets any of the criteria for sedative dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had

43

ordered treatment for sedative dependence. The mere fact that a sedative is prescribed does not warrant a diagnosis of sedative dependence.

163.   For senile purpura, the Problems List section of Patient 9426's medical records states "Senile purpura - Onset: 12/17/2020 - *HCC* D69.2." There is no clinical indication in the patient's medical records that supports a diagnosis of senile purpura. The Review of Systems section indicates that the patient reported "no bruising" and the Physician Exam section indicates that the patient's skin had "no rash, lesions or ulcer" upon inspection and palpitation.

164.   The Audit Analysis Spreadsheet includes a note for this encounter that states "Delete D69.2, no skin abnormalities on ROS [Review of Systems] or PE [Physical Exam]."

<u>Patient 6701</u>

165.   Patient 6701 presented to Northside Medical Associates, a Complete Health practice, on June 17, 2021 for her three-month follow-up visit for anxiety. The Assessment/Plan and Problems List sections of Patient 6701's medical records include diagnosis codes for benzodiazepine dependence (F1320) and senile purpura (D692), which Viva later submitted to CMS for payment. The diagnosis codes are not clinically supported.

166.   As to sedative dependence, the Problems List section of Patient 6701's medical records states "Sedative dependence - Onset: 01/06/2021 - *HCC* F13.20 Ambien." There is no other indication in the patient's medical records that supports a diagnosis of sedative dependence. The patient's medication list indicates that Patient 6701 filled her prescription for Zolpidem (brand name: Ambien) on April 8, 2021. The Assessment/Plan section of Patient 6701's medical records states that the patient takes Ambien "as ordered" for insomnia. There is no indication that Patient 6701 meets any of the criteria for sedative dependence,

44

including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for sedative dependence. The mere fact that a sedative is prescribed does not warrant a diagnosis of sedative dependence.

167.   As to senile purpura, the Problems List section of Patient 6701's medical records states "Senile purpura - Onset: 10/02/2020 - *HCC*D69.2." There is no clinical indication in the patient's medical records that supports a diagnosis of senile purpura. The Review of Systems section indicates that the patient reported "no bruising" and the Physician Exam section indicates that the patient's skin had "no rash, lesions or ulcer" upon inspection and palpitation.

168.   The Audit Analysis Spreadsheet includes a note for this encounter that states "verify F1320." It also provides, as to a prior encounter, "delete D692 skin exam states no rash or lesions."

Patient 8436

169.   Patient 8436 presented to Northside Medical Associates, a Complete Health practice, on October 21, 2020 for a "3 month check-up." The Assessment/Plan and Problems List sections of Patient 8436's medical records include a clinically unsupported diagnosis code for opioid dependence (F1120), which Viva later submitted to CMS for payment.

170.   The Problems List section of Patient 8536's medical records lists "Opioid dependence - Onset: 10/19/2020 - *HCC* F11.20 Hydrocodone." There is no other indication in the patient's medical records that supports a diagnosis of opioid dependence. Patient 8436's History of Present Illness section indicates that the patient presented to the clinic to discuss his depression, diabetes, hyperlipidemia, hypertension, and chronic kidney disease. The patient's medication list indicates that Patient 8436 was prescribed an opioid (Hydrocodone 5 mg/acetaminophen 325 mg) on October 21, 2020. The

45

Assessment/Plan section of this patient's encounter summary indicates that Hydrocodone was prescribed to treat pain in his right foot and back. The Assessment/Plan section indicates that Patient 8436's right foot pain is treated with "[g]reat efficacy with once daily dosing," characterizes Patient 8436's use of opioids as "infrequent," and notes that Patient 8436 takes opioids instead of other pain relievers like NSAIDS or Tylenol due to his chronic kidney disease. There is no indication that Patient 8436 meets any of the criteria for opioid dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for opioid dependence. The mere fact that an opioid is prescribed to a patient for chronic pain does not warrant a diagnosis of opioid dependence.

171.   The Audit Analysis Spreadsheet includes, as to this encounter, "Delete F11.20, hydrocodone prescribed for pain in right foot and back pain." It further provides, in a separate column, "Do not assign a code for the prescribed opioid use as described in this case. Without provider documentation of an associated physical, mental or behavioral disorder, 'opioid use' is not coded."

<u>Patient 5902</u>

172.   Patient 5902 presented to Northside Medical Associates, a Complete Health practice, on October 23, 2020. The Assessment/Plan and Problems List sections of Patient 5902's medical records include a clinically unsupported diagnosis code for sedative dependence (F1320), which Viva later submitted to CMS for payment.

173.   As to sedative dependence, the Problems List section of Patient 5902's medical records states "Sedative dependence - Onset: 10/21/2020 - *HCC* F13.20 - Ambien." There is no other indication in the patient's medical records that supports a diagnosis of sedative dependence. Patient 5902's History

46

of Present Illness section indicates that the patient presented to the clinic for a 4-month diabetic recheck and annual wellness visit. The patient's medication list indicates that Patient 5902 was first prescribed Ambien on October 23, 2020. The Assessment/Plan section of this patient's encounter summary lists Ambien in relation to the diagnosis of insomnia. There is no indication that Patient 5902 meets any of the criteria for sedative dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for sedative dependence. The mere fact that a sedative is prescribed to a patient for insomnia does not warrant a diagnosis of sedative dependence.

174.   The Audit Analysis Spreadsheet states "Delete F13.20. Member prescribed Ambien for insomnia."

175.   In addition, Patient 5902's Assessment/Plan list includes a diagnosis for type 2 diabetes mellitus with unspecified complications (E118). The Audit Analysis Spreadsheet indicated that this diagnosis should be deleted due to improper linking. It states, as to this encounter: "Delete E11.8 for diagnosis of disorder due to type 2 diabetes mellitus. No disorder is specified other than what is mentioned in reviewed Problems List ... Add E11.9 [HCC 19]."

### Patient 1913

176.   Patient 1913 presented to Northside Medical Associates, a Complete Health practice, on December 10, 2020. The chief complaint for this visit is stated as a "6 month check-up." The Assessment/Plan and Problems List sections of Patient 1913's medical records include a clinically unsupported diagnosis code for opioid dependence (F1120), which Viva later submitted to CMS for payment.

177.   The Problems List section of Patient 1913's medical records lists "Opioid dependence - Onset: 12/07/2020 - *HCC* F11.20 – Hydrocodone & Tramadol." There is no other indication in the patient's medical records that

47

supports a diagnosis of opioid dependence. Patient 1913's History of Present Illness section indicates that the patient was previously being seen by an orthopedist, Dr. Savage, for chronic back pain, and that due to his practice no longer taking her insurance, she was told to follow up with Northside Medical Associates to get refills of her pain medication. This section further states that she "currently uses Norco 7.5 twice a day when necessary (most of the time she only takes it once per day)" and "Tramadol 50 mg twice a day when necessary (uses it sparingly)." The Assessment/Plan section of this patient's encounter summary lists Hydrocodone and Tramadol in relation to the diagnosis of chronic pain syndrome. There is no indication that Patient 1913 meets any of the criteria for opioid dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for opioid dependence. The mere fact that an opioid is prescribed to a patient for chronic pain does not warrant a diagnosis of opioid dependence.

## Patient 1452

178.    Patient 1452 presented to Northside Medical Associates, a Complete Health practice, on December 8, 2020. The chief complaint for this visit was a "6 month check-up." The Assessment/Plan and Problems List sections of Patient 1452's medical records include a diagnosis code for opioid dependence (F1120), which Viva later submitted to CMS for payment. This diagnosis code is not clinically supported.

179.    The Problems List section of Patient 1452's medical records lists "Opioid dependence - Onset: 11/23/2020 - *HCC* F11.20 Norco." There is no other indication in the patient's medical records that supports a diagnosis of opioid dependence. Patient 1452's History of Present Illness section indicates that the patient presented to the clinic to discuss her Chronic Obstructive

48

Pulmonary Disease, depression and anxiety, diabetes, and hyperlipidemia. The Problems List section of the patient's records indicate that the patient suffered from "pain in limb," "pain radiating to thoracic region right side," and "abdominal pain." There is no indication that Patient 1452 meets any of the criteria for opioid dependence, including *any* of the diagnostic criteria set out in the DSM-5, or that the patient's provider had ordered treatment for opioid dependence. The mere fact that an opioid is prescribed to a patient does not warrant a diagnosis of opioid dependence.

180.  The Audit Analysis Spreadsheet states, as to this encounter, "Delete F11.20 opioid dependence member is prescribed hydrocodone filled by pain management." The Spreadsheet also indicates that, as to other encounters, Viva deleted codes relating to senile purpura (D692), type 2 diabetes mellitus with other specified complication (E1169), and others.

### 2.    *The Defendants Know, Recklessly Disregard, or Deliberately Ignore the Truth that Complete Health's Diagnosis Codes are Incorrect and Unsupported*

181.  The Defendants have acted with knowledge, reckless disregard, or deliberate ignorance of the truth that the diagnosis codes Complete Health submits to MA plans are incorrect and unsupported. Their knowledge is evident in multiple ways, including Complete Health's improper use of coders to insert unsupported diagnoses into patients' Problems Lists; Complete Health's efforts to dramatically increase the number of diagnosis codes they submit; the direct warnings Complete Health has received from Viva about its past diagnosis codes and ongoing, improper coding practices; Pharos's direct involvement in Complete Health's operations and strategy; and the MAO Defendants' direct

49

acknowledgement in internal discussions that Complete Health's risk adjustment data included incorrect and unsupported diagnosis codes.

i.       *Complete Health's and the MAO Defendants' Knowledge*

182.    Complete Health knows that the diagnosis codes it adds to patient medical records are routinely incorrect and unsupported. As explained below, Viva conducted an audit of Complete Health's diagnosis codes after discovering a sharp increase in the number of codes its providers submitted to Viva. The audit uncovered Complete Health's improper upcoding of multiple conditions. Viva detailed the upcoding to Complete Health executives, who acknowledged the improper codes but refused to change their practices or to delete any of the codes they had submitted.

183.    In 2021, Viva noticed a significant increase in its payments to Complete Health following Complete Health's acquisition of several primary care practices in Alabama.

184.    In June or July 2021, Pat Mizerany, the Director of Financial Analytics at Viva, called Relator to alert her to the increase. Soon thereafter, Mr. Mizerany followed up on their discussion with an email:

> As we discussed, the mid-year payment for [Complete Health] was remarkably higher than other [Provider Organizations] in both total dollars and on a [per month per member] basis.
>
> Additionally, the [Complete Health's] risk score is now the highest of all PORGs …

185.    By mid-July 2021, at Relator's direction, Viva began pulling patient medical records from Complete Health's EMR to audit Complete Health's risk adjustment data. Viva employed 4–5 certified coders to review patient records over the course of several months and soon uncovered significant problems with

Complete Health's diagnosis codes. Viva was able to audit over 600 Complete Health members. From just those records, Viva found thousands of invalid diagnosis codes without clinical justification.

186.   The audit results contain detailed records documenting Complete Health's upcoding. For example, Viva's audit of the medical records of Patient 4276 analyzed several patient encounters, including Patient 4276's January 15, 2021 encounter. As to that encounter, Viva's auditors recommended deleting or modifying several codes on Patient 4276's chart, including the diagnosis codes for opioid dependence (F1120), benzodiazepine dependence (F1320), and senile purpura (D692). The auditors note state, as relevant here:

> delete D692 purpura as skin exam is normal, delete F1120 opioid dependence, delete F1320 sedative dependence … Member has chronic pain syndrome that the provider is treating with opioids. Coding Clinic 2018 advises us not to use use/dependence when in a chronic pain situation. There is not enough information to support a diagnosis for sedative dependence.

187.   Viva provided the audit results to Complete Health and held multiple meetings with Complete Health executives in which it warned the executives about their upcoding. In those meetings, Complete Health acknowledged numerous examples of upcoding but refused to change their practices, which have been highly lucrative for the company.

188.   In approximately July 2021, Carol Davis, Executive Director of Provider Engagement and Risk at Viva, spoke by phone with Complete Health's Chief Medical Officer, Dr. John Farley, about his company's coding practices. Dr. Farley told Ms. Davis that he had instructed Complete Health to "keep its coders out" of his patient's records and that Complete Health was adding diagnosis codes that his patients did not have.

51

189.   Notably, Dr. Farley, who has served as Complete Health's Chief Medical Officer since October 2020, did not complain of these improper codes because they resulted in overpayments by CMS. Instead, Dr. Farley was upset that these improper codes affected his performance bonus from Viva relating to certain performance measures. In the phone call with Ms. Davis, Dr. Farley explained that a coder had added rheumatoid arthritis ("RA") to a patient's medical record when that patient did not have RA. Because Dr. Farley had not treated the nonexistent condition—he had not prescribed the patient an RA medication—he failed the performance metric.

190.   On July 29, 2021, Viva held a conference call with Complete Health executives including Vice President of Value-Based Care Vickie Wilson, who oversees Complete Health's risk adjustment operations, Director of Medicare Risk Adjustment & Quality Jeanette Jones, and Vice President Christian Long. The participants from Viva were Carol Davis, Viva Supervisor of Risk Adjustment Denise Powell, and Relator.

191.   On the call, Ms. Davis told Complete Health that she was concerned that Viva was submitting risk adjustment data that it knew to be false based on its review of Complete Health patient records. Ms. Davis further expressed concern about Viva's ability to attest to the truth, accuracy, and completeness of its risk adjustment data in light of its audit findings. Ms. Davis provided examples of improper coding and explained that Complete Health's significant jump in risk scores (diagnosis codes affecting risk adjustment payments) raised OIG audit risks. She asked Complete Health about its practice of using coders to add diagnosis codes to patient records, particularly for opioid dependence, senile purpura, and major depression, and expressed concern about Complete Health revoking Viva's access to its EMR.

52

192.   In the course of the discussion, Complete Health conceded that it had improperly coded a patient with opioid dependence. Relator asked Vickie Wilson about a particular patient who had been diagnosed with opioid dependence (F1120) despite medical records indicating only that the patient had taken hydrocodone/acetaminophen for 3–4 years, "PRN"—meaning on an "as needed" basis—with no indicators of clinically significant dependence. Ms. Wilson responded that "after so long [on the medication], they are dependent." When Relator challenged that incorrect assertion, Ms. Wilson conceded that "clinically speaking" the patient did not have opioid dependence despite Complete Health's having coded that condition.

193.   On March 14, 2022, Viva met with Complete Health to discuss Viva's concerns about Complete Health's coding practices. The meeting participants for Complete Health were Dr. Farley; Ms. Wilson; Senior Medical Reimbursement Arrangement Provider Educator Tami Ellison; Senior Director of Revenue Cycle Robin Campbell; and Dr. Andrew Smith, a Birmingham-based Complete Health physician who joined via videoconference. The participants for Viva were Carol Davis, Denise Powell, Director of Strategic Network Initiatives Robert Hensley, and Relator.

194.   During the meeting, Viva again warned Complete Health about its coding practices, raising particular concern about substance use disorders, major depression, senile purpura, and the linking of unrelated conditions. With respect to substance use disorders, Ms. Wilson and Ms. Ellison acknowledged that Complete Health diagnoses patients with substance use disorders based solely on their taking a prescribed medication. The managers explained that Complete Health will code a patient with a substance use disorder if the patient is dependent on the medication, whether or not the patient manifests the criteria

53

required for dependence under the DSM-5. When Relator raised those criteria with the Complete Health representatives and remarked that the use of an opioid is insufficient to diagnose a patient with opioid use disorder, Dr. Farley, who had joined Complete Health in 2020, stated that "when they came in and told me to do this, I had a problem with it. I have family who have a substance abuse clinic and I understand what you're saying." Dr. Farley then continued that he had "come around" to Complete Health's incorrect coding practices. Dr. Smith, meanwhile, said that the patients Complete Health was coding with substance use disorders were those who were reliant on their medications. When Relator asked whether Dr. Smith's patients were abusing their medications, he responded that they were not.

195.    Neither Dr. Farley nor Dr. Smith disputed that the DSM-5 sets forth the clinical standard for diagnosing substance use disorders and neither of them was able to support Complete Health's coding guidelines under the DSM-5 standard. Indeed, when Relator showed the DSM-5 criteria to Dr. Smith, he summarily ended the discussion and disconnected his video feed.

196.    In the course of the discussion, Complete Health admitted that its patients had called to complain about having been diagnosed with opioid use disorder. The representatives justified their diagnoses of such patients by arguing that the same patients would complain if their physicians discontinued their medication. Their reasoning only reinforced Complete Health's brazenly incorrect standard: that any patient who needs their prescription for an opioid or sedative must have a substance use disorder.

197.    With respect to major depression, the Complete Health representatives asserted that their coders added F330 diagnoses to the Problems List as a "suggestion" for providers. Relator explained, however, that Complete

54

Health was submitting the diagnoses its coders had added when physicians' documentation would support only F329 (major depressive disorder, single episode, unspecified), which does not correspond to a risk score. Relator further warned Complete Health about patients it had diagnosed with major depression but not referred to behavioral health services. Addressing the lack of referrals for behavioral health services, Dr. Farley asserted simply that it is "hard to get mental health referrals in the area, especially for Medicare patients."

198.   As to senile purpura, Complete Health admitted that its documentation did not support the diagnosis codes it had submitted. The Complete Health representatives told Viva, however, that the company would now "educate" its providers so that their documentation reflects the diagnosis codes they submit. This solution violates the core coding principle that the medical record documentation should determine the diagnosis code, not the other way around.

199.   With respect to other conditions that Complete Health had diagnosed, Complete Health stated that it would "educate" its providers to avoid improper linking codes, including instances where Complete Health had linked a condition to a complication despite the complication having been diagnosed independently prior to the condition being diagnosed (e.g., a diagnosis of kidney disease with renal complications when the patient's kidney disease diagnosis predated their diagnosis of diabetes).

200.   Throughout the discussion, Complete Health made clear that its procedures only "lead" providers to the diagnosis codes that correspond to increased risk adjustment payments. Complete Health acknowledged that the conditions its coders add to the patients' Problems Lists included a specific ICD-10-CM code and corresponding HCC, thus directing the provider to a specific

condition and showing the provider that the condition would increase reimbursement. This system also violates standards that forbid coders from leading a provider to a specific diagnosis, let alone a specific diagnosis code.

201.   When presented with examples of its coders leading providers to ICD-10-CM codes that were incorrect or exaggerated the patient's medical condition, Complete Health disclaimed the foreseeable consequences, stating that the codes were "suggestions" that providers did not have to accept. In reality, the widespread, sharp increases in diagnoses stemming from coder "suggestions" shows that Complete Health's providers adopted the conditions—and ICD-10-CM codes—the coders had added to the Problems List.

202.   Complete Health also acknowledged that it attempts to remove the coders' HCC suggestions from appearing in the patients' medical records following the encounter. It told Viva that its providers were supposed to scrub the HCC prompts from the patients' medical records when they "pull the condition over" into the encounter notes. This expectation, which providers often did not follow, would conceal that Complete Health's coders had directed the providers to the diagnoses that correspond to risk adjustment payments.

203.   In addition to the conversations described above, Complete Health actively resisted Viva's audit of its practices. Viva informed Complete Health of the audit while it was still in progress; upon learning of the audit, Complete Health immediately revoked Viva's access to its EMR. Complete Health did not restore Viva's access to its EMR until February 2022. Complete Health claimed that its initial revocation related to "privacy" concerns about sharing patient information. Relator has information and believes, however, that Complete Health revoked Viva's access to interfere with the audit and prevent further review of its coding practices.

204.   Complete Health also resisted Viva's other initial efforts to correct its coding practices. As part of its audit, Viva asked Complete Health to allow it to participate in one of Complete Health's coding training sessions to better understand what Complete Health was telling its providers and coders about diagnosis coding. Complete Health refused to allow anyone from Viva to participate or attend any training. On information and belief, Complete Health refused to allow Viva to attend these trainings because it did not want to reveal the impropriety of its practices.

205.   Furthermore, Relator has information and believes that Complete Health continues to improperly add diagnosis codes to patient claims despite Viva's repeated warnings about the impropriety of its conduct.

206.   Viva, for its part, decided to allow Complete Health to submit false diagnosis codes to increase its capitation payments.

207.   Similarly, BCBS knew, deliberately ignored, or recklessly disregarded Complete Health's submission of incorrect and unsupported diagnosis codes. In June 2022, Relator joined BCBS to oversee its risk adjustment analytics. In her new position, Relator was responsible for the analysis of the risk adjustment data that BCBS received from providers and submitted to CMS. Relator managed BCBS's risk adjustment analysts, ensured that risk adjustment data submissions went to CMS in a timely manner, monitored the data for outliers, and forwarded outliers for audit by BCBS's coding staff.

208.   BCBS, like Viva, contracted with Complete Health to provide primary care services to its patients. When the Relator joined BCBS, she soon encountered risk adjustment data that Complete Health had submitted and found that Complete Health's coding practices with respect to BCBS's members were the same as those she had witnessed with respect to Viva's members.

57

209.   In September 2022, the Relator asked Ashley Driskill and Bijan Tajmir, BCBS's Medicare Advantage Quality Management Analysts, to run a report analyzing Complete Health's risk adjustment codes. The Relator described her concerns about Complete Health to Driskill and Tajmir and what she expected the data to show—a surge in the number of diagnoses Complete Health submitted for conditions that correspond to increased reimbursement under CMS's risk adjustment model.

210.   On October 27, 2022, Driskill emailed the Relator and Tajmir, attaching a spreadsheet, "Counts_by_ICD_Code_by_Year_ALD.xlsx," with the requested analysis of risk adjustment codes used by Complete Health. That spreadsheet showed dramatic increases in risk adjustment coding by Complete Health for the many of the conditions outlined above, including Depression, Substance Abuse, and linked diabetes. Driskill listed almost all of the conditions on the spreadsheet as a "Potential Problem."

211.   For example, the spreadsheet showed percentage increases in Complete Health's coding of D692 (senile purpura) of 2350%, 310%, and 339% in 2018, 2019, and 2020 respectively. For E1169 (diabetes with complications), the diagnoses increased 283%, 229%, and 209% over the same time period. Similarly, coding for Depression and Substance Dependence codes increased over 100% in several years, including consecutive years.

212.   Driskill's email noted that the Relator's "suspicion is correct"—that is, Complete Health had dramatically increased the number of diagnosis codes it submitted for conditions that would increase BCBS's risk adjusted payments.

213.   The dramatic increases in the number of patients Complete Health had diagnosed with specific conditions that correspond to higher reimbursement presented a clear danger that many of those diagnoses were incorrect or

58

unsupported. Having confirmed the significant change in Complete Health's coding practices—changes that applied only to conditions that corresponded to increase reimbursement—BCBS was obligated to investigate whether the additional codes were accurate and truthful.

214.    The Relator forwarded Driskill's email, along with the spreadsheet, to BCBS management responsible for risk adjustment data: Pamela Majors, Department Manager of Medicare Advantage Quality Management for Risk; Meagan Stephens, Medicare Advantage Risk Manager; and Melissa Francis, Medicare Advantage Network Integration Manager. Despite Complete Health's extraordinary increases in diagnosis codes for specific conditions, the BCBS executives took no action to audit Complete Health's diagnosis codes to ensure they were accurate.

215.    At the time Relator left BCBS, BCBS continued to allow Complete Health to submit diagnosis codes and had taken no action to investigate Complete Health's coding practices. To the contrary, BCBS was working to enter into a full risk share agreement with Complete Health that would further incentivize Complete Health to increase the number of conditions it diagnosed.

216.    In refusing to audit Complete Health's diagnosis codes despite the clear danger that many were incorrect or unsupported, BCBS either deliberately ignored or recklessly disregarded the truth that Complete Health's diagnosis codes were incorrect or unsupported.

ii.    *Pharos's Knowledge of Complete Health's Improper Coding Practices*

217.    Pharos knows, has recklessly disregarded, or acted in deliberate ignorance of the truth that Complete Health submits improper diagnosis codes for risk adjustment payments. Complete Health markets itself based on its

59

expertise in risk adjustment. Pharos actively participates in the management of Complete Health and "works closely with company management to formulate strategic plans and actively monitor performance through participation in the operational review process." Risk adjustment is a central part of Complete Health's business and its misconduct in generating diagnosis codes is brazen. Given its close involvement in Complete Health's operations and its expertise in healthcare, Pharos knows, has recklessly disregarded, or has purposely avoided the truth that Complete Health is submitting incorrect and unsupported diagnosis codes to improve its financial bottom line.

### 3. The MAO Defendants Have Knowingly and Improperly Avoided Returning Overpayments to CMS Arising From Complete Health's False and Fraudulent Diagnosis Codes

218.   Despite their knowledge that Complete Health's risk adjustment data contains incorrect or unsupported diagnosis codes, the MAO Defendants have knowingly and improperly refused to return overpayments to CMS as required.

219.   Viva, after conducting a partial audit and deleting improper codes, changed course in mid-2022 after senior leadership expressed concern about the potential loss of revenue and Complete Health leaving its contracted provider network. Viva terminated its audit and ceased further audits.

220.   Viva terminated the audit into Complete Health despite knowing that the audit had uncovered thousands of incorrect and unsupported diagnosis codes. Initially, as a result of its audit, Viva submitted thousands of deletion requests to CMS relating to diagnosis codes improperly added to patient claims by Complete Health relating to payment year 2020 and 2021. Most of these diagnosis codes were single-source diagnoses—meaning no other non-Complete

60

Health provider diagnosed the patient with the same condition, even when those patients saw other, non-Complete Health providers that year.

221.  Viva's senior leadership knew that Viva had deleted incorrect and unsupported diagnosis codes as a result of the audit and that continuing the audit would result in Viva uncovering and deleting more incorrect and unsupported diagnosis codes. Indeed, Viva's leadership terminated the audit because they were unwilling to lose the reimbursement associated with those incorrect and unsupported codes. At the time, more than sixty days had lapsed from Viva's initial audit findings and Complete Health's admissions about its improper coding practices. In stopping the audit to protect its financial interests, Viva knowingly and improperly avoided an obligation to return overpayments to the Government.

222.  Similarly, BCBS refused to audit Complete Health's diagnosis codes despite having identified steep increases between 2018 and 2020 in the number of patients diagnosed with conditions that corresponded to higher reimbursement from CMS, which put BCBS on notice of a potential overpayment. On information and belief, BCBS's refusal extended more than sixty days from the analysis that identified the potential overpayments. Accordingly, BCBS knowingly and improperly avoided its obligation to return overpayments to the Government.

## B.    BCBS's Fraudulent Risk Adjustment Incentive Program

223.  In addition to disregarding Complete Health's unlawful coding practices, BCBS has engaged in a pattern and practice of financially incentivizing all of its providers to submit diagnosis codes to increase payment from CMS under Medicare Part C. This scheme involved per member per month incentive

61

payments to all BCBS providers who met demanding risk adjustment coding requirements.

224. BCBS's incentive program was based on each provider's "recapture rate." The recapture rate refers to the percentage of a patient's diagnosed conditions from a prior year that the provider diagnoses (or "recaptures") in the current year. BCBS encourages providers to recapture diagnoses so that it will continue to receive risk adjustment payments for the condition in the upcoming contract year. In addition to previous diagnoses, BCBS measures a provider's recapture rate based on conditions that BCBS suspects the patient might have based on its review of the patient's medical records. BCBS prepares lists of these "suspect" conditions for providers to consider when visiting patients. Thus, a provider's recapture rate reflects the provider's diagnosis of previously diagnosed conditions as well as other conditions that BCBS suggests to the provider. To maximize its risk adjustment revenue, BCBS intends for providers to diagnose as many of these conditions as possible.

225. To incentivize providers to make as many diagnoses as possible, BCBS offers a financial incentive to providers based on the percentage of a patient's diagnoses they recapture. If a provider diagnosed a patient with a minimum percentage of the patient's prior or suspected diagnosis codes, the provider would receive an incentive payment for that patient.

226. BCBS paid $25 per member per month to providers who had a risk adjustment "recapture rate" between 75–79 percent, $50 per member per month to providers who had a recapture rate between 80–84 percent, and $100 per member per month to providers who had a recapture rate above 85% percent. BCBS made these incentive payments to providers in 2023 based on their recapture rates in 2022. (Before 2022, BCBS implemented a different risk

adjustment incentive coding program called the "Coding Accuracy" incentive program.)

227.  BCBS's incentive payment applies only to conditions that would increase its reimbursement under CMS's risk adjustment model. The "recapture rate" does not account for conditions that would not increase reimbursement but that might improve quality of care. The one and only goal of the incentive program is to increase BCBS's revenue.

228.  BCBS's incentive program encouraged providers to create or perpetuate diagnoses that are incorrect or unsupported. One way the program incentivized incorrect or unsupported codes is that it required some providers to diagnose conditions outside their area of expertise in order to be eligible for an incentive payment. For example, while the incentive program is available to behavioral specialists, those specialists often cannot qualify for an incentive payment without diagnosing the patient with non-behavioral conditions such as heart disease or diabetic complications. Because providers' performance is not limited to conditions that they diagnosed in the past or otherwise would have reason or expertise to diagnose, it incentivizes providers to make diagnoses that are incorrect or lack support.

229.  Another way in which the program results in incorrect and unsupported codes is that it incentivizes providers to recapture prior conditions that were incorrect or unsupported in the first instance. In fact, many providers complained to BCBS that the risk adjustment codes they were expected to recapture were incorrect and they did not want to be "penalized" in so far as not diagnosing the incorrect condition would lower their recapture rate and make it more difficult to qualify for incentive payments.

63

230.   In response to such complaints, BCBS started working on a dispute system by which providers could dispute the applicability of risk adjustment codes BCBS's incentive system were requiring providers to capture. For example, this system would let providers dispute risk adjustment codes that other providers had added for a patient to remove those disputed risk adjustment codes from the recapture rate calculation. Perversely, however, the dispute system would not allow providers to dispute codes that they themselves had diagnosed in the past. If other words, if a provider determined that a risk adjustment code they had coded in a prior year was invalid, they had no effective way of removing it from the recapture rate. Through this restriction, BCBS openly incentivized providers to perpetuate their mistakes.

231.   Furthermore, while the dispute system would avoid penalizing providers for at least some incorrect diagnosis codes, BCBS declined to investigate whether disputed risk adjustment codes should be deleted from its risk adjustment submissions. Thus, when a provider alerted BCBS to an incorrect condition, BCBS would not investigate whether that condition had been submitted for payment in a prior year and should be deleted—that is, BCBS did not delete risk adjustment codes that providers, through the dispute system, had informed BCBS were invalid or unsupported.

232.   BCBS never fully implemented the dispute system and thus continues to incentivize providers to recapture incorrect and unsupported diagnosis codes.

233.   More than half of BCBS providers earned a recapture incentive in 2022: 53.8% of provider or 942 providers earned an incentive in 2022.

64

a. 286 providers or 16.3% had a recapture rate between 85–100% and earned a per member per month incentive with respect to 6,441 members.

b. 270 providers or 15.4% had a recapture rate between 80–84% and earned a per member per month incentive with respect to 9,661 members.

c. 386 providers or 22.1% had a recapture rate between 75–79%, and earned a per member per month incentive with respect to 14,452 members.

234. BCBS knew that the incentive program violated CMS guidelines and incentivized providers to submit incorrect or unsupported diagnoses. Relator repeatedly warned her superiors, including Pamela Majors, Meagan Stevens, Stacey Walters (Director of Medicare Advantage Quality Management), and Melissa Francis, that the incentive program violated CMS coding guidelines.

235. For example, during a "coder brunch"—a monthly coding education meeting consisting of BCBS coders in the Risk Adjustment department and certain BCBS executives, including Melissa Francis and Meagan Stephens— Relator warned that it was improper for BCBS to incentivize providers financially to diagnose conditions. After those in the room rebuffed her concerns, on June 16, 2022, Relator wrote Melissa Francis, Meagan Stephens, and others, including BCBS nurses Michelle Ingram, Justin Williford, Sara Foust, and Bethany Goss, identifying the AHA Coding Clinic Guidelines that the incentive program violated. That guidance provided that diagnosis codes "must affect care and management of the patient" and be "related to the coding for a single specific encounter in time." For example, as to chronic conditions, they could be coded from "visits, encounters or hospitalizations *when the chronic condition affected*

65

*care or needed management.*" (Emphasis added.) BCBS's incentive program, which stood to induce providers to code conditions without regard for whether they affected the care or management of the patient or had any relationship to the specific encounter, clearly violated the Guidelines.

236.   In addition, BCBS knew from provider complaints about the incentive program that many of the conditions it encouraged providers to diagnose were incorrect. By continuing the incentive program without either implementing the dispute program or investigating incorrect diagnoses for potential deletion, BCBS knowingly caused providers to submit false diagnosis codes and avoided its obligation to return overpayments.

237.   BCBS executives acknowledged that the incentive program was improper and informed Relator that BCBS would discontinue the program by 2024. For example, on November 2, 2022, Olivia Turner, a BCBS Senior Project Manager, wrote Pamela Majors, Relator, Melissa Francis, and others about using a minimum 77% recapture rate incentive in 2023. At the same time, she stated that BCBS was considering "mov[ing] to the background" its focus on "recapture rate" in 2024 "due to industry scrutiny on coding incentive programs." Nonetheless, BCBS continued its 2022 incentive payments and, on information and belief, is continuing to provide incentive payments through 2023 that require even higher recapture rates than were required in 2022. Thus, BCBS continued to incentivize providers to generate diagnosis codes in 2022 and 2023 despite knowing that the incentive program violates CMS coding guidelines.

## VI.    The Defendants' Violations of the FCA

### A.    Complete Health Defendants' Violations of the FCA

238.   Through the conduct described above, the Complete Health Defendants knowingly caused and causes MAOs—including the MAO

Defendants—to submit false claims for payment by sending invalid diagnosis codes to MAOs to submit to CMS.

239.   Whenever Complete Health submitted a false HCC that was the only such HCC for the patient in the service year, CMS calculated a higher risk score for the patient than it would have calculated if Complete Health had not submitted the false HCC. Based on the higher risk score, CMS overpaid the patient's MA plan in its monthly capitation payments for the patient.

240.   Complete Health made, used, and caused to be made and used, false records and statements material to false claims. Each invalid diagnosis code that Complete Health submitted to MAOs constituted a false record or statement material to a false claim because the invalid codes were not eligible for submission to CMS. The diagnosis codes were material to false claims because the MAOs presented the records to CMS for payment and CMS paid the MAOs based on those claims.

241.   On information and belief, Complete Health also made and used false records and statements in executing First-Tier and/or Downstream agreements with MAOs in which it represented that it would comply with CMS requirements. The records and statements were material to false claims because MAOs reasonably would not have presented Complete Health's diagnosis codes to CMS if Complete Health had truthfully disclosed that that its risk adjustment data did not meet CMS requirements.

242.   Complete Health additionally caused MAOs to make and use false records and statements material to false claims in that the MAOs submitted risk adjustment attestations and executed EDI agreements representing that the risk adjustment data they submitted were truthful, complete, and accurate. The representations were false because the data included invalid diagnosis codes from

67

Complete Health. The representations were material because CMS reasonably would not have paid the MAOs, and/or would have reduced its payments to the MAOs, if the MAOs had disclosed to CMS in their attestations and EDI agreements that the risk adjustment data they submitted included false diagnosis codes from Complete Health.

243. Complete Health knew, recklessly disregarded, or was indifferent to the truth that the claims, records, and statements were false. Complete Health knew, and had reason to know, that employing coders to add diagnosis codes based on insufficient clinical data caused CMS to overpay for risk adjustment purposes.

244. Complete Health knowingly made, used, and caused to be made and used, false records or statements material to an obligation to remit overpayments to CMS, and concealed or knowingly and improperly avoided or decreased an obligation to remit overpayments to CMS, by failing to delete diagnosis codes that Complete Health knew were invalid. Complete Health concealed and knowingly and improperly avoided an obligation to remit overpayments to CMS when it failed to delete invalid diagnosis codes within 60 days of knowing the codes were false. By not deleting diagnosis codes as required, Complete Health also caused MAOs to misrepresent to CMS in annual certifications that the risk adjustment data they had submitted were truthful, complete, and accurate. CMS reasonably would not have paid the MAOs, and/or would have recovered or reduced its payments to the MAOs, if the MAOs had disclosed to CMS in their attestations that the data they had submitted included false diagnosis codes from Complete Health.

68

**B.    The MAO Defendants' Violations of the FCA**

245.   Through the conduct described above, the MAO Defendants knowingly present and cause the presentment of false claims for payment by sending invalid diagnosis codes to CMS and incentivizing providers to generate invalid diagnosis codes.

246.   Whenever the MAO Defendants submitted a false HCC that was the only such HCC for the patient in the service year, CMS calculated a higher risk score for the patient than it would have calculated if the MAO Defendants had not submitted the false HCC. Based on the higher risk score, CMS overpaid in its monthly capitation payments for the patient.

247.   The MAO Defendants made, used, and caused to be made and used, false records and statements material to false claims. Each invalid diagnosis code that the MAO Defendants submitted to CMS constituted a false record or statement material to a false claim because the invalid codes were not eligible for submission to CMS. The diagnosis codes were material to false claims because the MAOs presented the records to CMS for payment and CMS paid the MAOs based on those claims.

248.   On information and belief, the MAO Defendants also made and used false records and statements in executing First-Tier and/or Downstream agreements in which they represented that they would comply with CMS requirements.

249.   The MAO Defendants made and used false records and statements material to false claims in that they submitted risk adjustment attestations and executed EDI agreements representing that the risk adjustment data they submitted were truthful, complete, and accurate. The representations were false because the data included invalid diagnosis codes from Complete Health and in

69

at least the case of BCBS, other providers. The representations were material because CMS reasonably would not have paid the MAOs, and/or would have reduced its payments to the MAOs, if the MAOs had disclosed to CMS in their attestations and EDI agreements that the risk adjustment data they submitted included false diagnosis codes.

250.  The MAO Defendants knew, recklessly disregarded, or were indifferent to the truth that the claims, records, and statements were false. For example, the Relator repeated warned executives at both Viva and BCBS that their conduct was resulting in the submission of false risk adjustment codes. Viva executives received audit results showing that large numbers of Complete Health's diagnosis codes were incorrect or unsupported, while Complete Health openly acknowledged that its coding practices were improper. BCBS, meanwhile, conducted an analysis showing large increases in the number of revenue codes Complete Health submitted, information that put it on notice that Complete Health was inventing or exaggerating its patients' conditions for profit.

251.  The MAO Defendants knowingly made, used, and caused to be made and used, false records or statements material to an obligation to remit overpayments to CMS, and concealed or knowingly and improperly avoided or decreased an obligation to remit overpayments to CMS, by failing to delete diagnosis codes that they knew were invalid. The MAO Defendants concealed and knowingly and improperly avoided an obligation to remit overpayments to CMS when they failed to delete invalid diagnosis codes within 60 days of identifying diagnosis codes as invalid or potentially invalid. By not deleting diagnosis codes as required, the MAO Defendants misrepresented to CMS in annual certifications that the risk adjustment data they had submitted were truthful, complete, and accurate. CMS reasonably would not have paid the MAOs, and/or would have

70

recovered or reduced its payments to the MAOs, if the MAOs had disclosed to CMS in their attestations that the data they had submitted included false diagnosis codes.

**Count I**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)–(B), (G)**

252.    Relator realleges and incorporates by reference the allegations contained in all paragraphs of the Complaint as if fully set forth herein.

253.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

254.    By virtue of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

255.    By virtue of the acts described above, the Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

256.    By virtue of the acts described above, the Defendants knowingly made false records or statements material to an obligation to pay money or property to the Government, and concealed and knowingly and improperly avoided or decreased an obligation to pay money or property to the Government.

257.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal conduct.

258.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

71

259.   Additionally, the United States is entitled to the maximum penalty permitted for each and every violation alleged herein.

## PRAYER

WHEREFORE, Plaintiff-Relator prays for judgment against Defendants as follows:

260.   That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*

261.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum civil penalty for each violation of 31 U.S.C. § 3729;

262.   That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

263.   That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

264.   That Relator recover such other relief as the Court deems just and proper.

72

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: March 9, 2023

/s/ Jeffrey W. Dickstein
Jeffrey W. Dickstein
PHILLIPS & COHEN, LLP
PO Box 398508
Miami Beach FL 33239
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Edward H. Arens
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com
(Admitted pro hac vice)

73

## Certificate of Service

I hereby certify that a copy of the foregoing has been served by certified mail and email on the following on March 9, 2023:

Olga Yevtukhova
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch, Fraud Section
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
olga.yevtukhova@usdoj.gov

Collette B. Cunningham
Assistant United States Attorney
United States Attorney's Office for the Middle District of Florida
Florida Bar No. 0012737
Bryan Simpson U.S. Courthouse
300 North Hogan Street, Suite 700
Jacksonville, FL 32202-4270
Telephone: (904) 301-6326
collette.cunningham@usdoj.gov

/s/    Travis Mintier
Travis Mintier

74